### STATE *vs.* COLUMBUS ADAIR and others.

1. The 12th section of Article 4 of the Constitution, which provides "the State shall be divided into twelve districts, for each of which a Judge shall be chosen, who shall hold a Court in each county, at least twice in each year, to continue for two weeks," does not by express words, or necessary implication restrict the Legislature from passing an Act authorizing a Judge under certain circumstances to continue a Court longer than two weeks.

2. Therefore, sec. 397, C. C. P., which authorizes a Judge, "in case the term of a Court shall expire while a trial for felony, &c., is in progress, to continue the same as long as may be necessary for the purposes of the case, is not unconstitutional.

3. Where a witness in a case of homicide stated to another person that she had received several severe wounds, and believed she would die, and desired a a neighbor to be sent for; that she wanted to "tell all about it, and who did it," *Held* that such statements were competent as confirmatory testimony, and and the fact that the witness said she would die, would furnish no ground for their exclusion.

4. It is competent for a magistrate to state what a witness swore before him in regard to the homicide, although he afterwards committed the statement to writing. Such statement could only be referred to, to refresh his memory, and was properly treated as a memorandum.

STATE *v.* COLUMBUS ADAIR *et al.*

5. ·Where one of the prisoners in this case was present and heard a conversation between the magistrate and his (prisoner's) father, and saw the confusion of the father when a certain statement was made in regard to the principal State's witness, *Held,* that this fact was admissible as confirmatory testimony.

6. After jurors are sworn, but before they are empanelled, it is competent for the Court to allow a challenge for cause.

This was an indictment tor the murder of W. H. Stead-man *alias* Lee, tried before Cloud, Judge, at Fall Term 1871 of Henderson Superior Court :

Polly Weston, the principal witness on the part of the State, swore that she was the wife of one Silas Weston, that she had four children, the deceased William Herbert Steadman *alias* Lee, being one of them. That she lived with her husband and these children, in Rutherford county, N. C. That on the the night of the 26th of April last, about one hour in the night, she and three children had risen from the supper-table, leaving Silas Weston, her husband, at the table feeding the baby. She heard the growl of a dog in the yard, and went to a crack in the end of the cabin in which they lived, to see what had disturbed the dog. On putting her face to the crack she was fired on, the powder burning her eye, and she staggered back, exclaiming "I'm killed. God have mercy on me!" The door was then burst open, and Govan Adair, one of the prisoners, as he entered the house, fired on her husband while while he was seated at the table, and again as he retreated to the other end of the house. Govan Adair and Martin Baynard, another one of the prisoners, then seized her husband, dragged him down and cut his throat. As Columbus Adair, the other prisoner, came into the house, he fired on David and Theodosia, two of the children, and then shot the deceased. The two first named children were killed instantly. The deceased breathed twice, with a gurgling sound, and exclaming, "they have killed me !" While the shooting and cutting her husband's throat was going on, witness attempted to get under the bed. Govan Adair and Martin Baynard

dragged her out, and Govan Adair attempted to shoot her, but his pistol did not fire.   He and Baynard then gave her seven severe wounds, leaving her, as they had supposed, dead ; they then attempted to cut her infant's throat, set the bedding on fire, and fled from the house.   She lay upon the floor, until the flames began to burn her hair, when, finding ·her infant still alive, she took it and placed it outside the house, returned, and dragged out Theodosia, whom she left lying just outside the burning [house, dead, being unable to carry her further on account of a wound in her arm and shoulder.   She made her escape to a Mrs. Williams' house, about a mile from the scene of the murder.   She gave to Mrs. Williams and her husband, substantially the above account of the murder of her family, and related it to others whom she saw that night and next day, pretty much in the same way.

The next morning the house was found in ashes, and the remains of three human bodies, corresponding in size to Silas Weston and the children, were found on the site of the burnt house, and the child Theodosia was found dead with a bullet hole through her breast, and her body burnt and lying where the witness Polly Weston said she had left it; when she escaped from the flames the night before.

In the examination of Polly Weston, defendant insisted that in her narrative she should be confined to the statement of facts connected with the killing of Wm H. Steadman, and not be allowed to detail the particulars of the other homicides. This objection was overruled by the Court.

Mrs. Williams was examined by the State to prove what Polly Weston had said to her. when she came to her house, on the night of the .alleged homicide.   She stated, "That Polly asked me to send for Mrs. Morgan, who lived a short distance from witness, that she wanted to tell her all about it, and who did it, before she died, as she expected and believed she would die."   Objection was made to declarations of Polly Weston, that " she would die, or expected to die," from the injuries

which she had received. The Solicitor insisted that it was proper as confirmatory of Polly Weston's testimony, the defendant's counsel having impeached her testimony in the cross examination, &c., and she was farther impeached in the course of the trial. This testimony was admitted by the Court.

Hanes, a magistrate, was examined to show what statement Polly Weston had made to him on the next morning after the trial. He said that he swore Polly but did not then take down her statement; but afterwards, on the same day, wrote it down. He was proceeding to tell what she had said, on oath, about the murder. This was objected to, but admitted by the Court. The written statement was not offered, nor its loss accounted for.

It was also in evidence, that when Hanes, the magistrate, went with a *posse* to the house of Henderson Adair, (father of two of the defendants,) the next morning after the homicide, to arrest the defendants, that on being asked the question, "Where was Baynard last night?" and in such a manner as to charge him with participation in the homicides, Govan Adair denied all knowledge of Baynard's whereabouts the night before, and repelled the charge that he had any agency in, or knowledge of the murder.

The State then offered to prove as a circumstance against Govan Adair, that Hanes. and Henderson (the father) were talking in the presence and hearing of Govan, and that Hanes told Henderson that Polly Weston had made *affidavit before him*, who had committed the homicide. And immediately thereupon, Henderson Adair exclaimed, "Is she not dead? Did ever I hear the like?" This was objected to, but admitted by the Court. The State then asked witness what was Henderson's manner when he made the exclamation, "Is she not dead?" This was objected to, but admitted by the Court. Witness stated that Henderson looked confused.

After twelve jurors were tendered and accepted by the prisoners and sworn, but before they were empanelled, the Court

was informed, that one of the jurors was related by affinity to two of the prisoners, which appeared upon inquiry to be so, but this fact was not known to the counsel on either side, or to the Court when the juror was sworn. This juror was discharged, to which prisoners' counsel excepted. Another was tendered whom the prisoners took.

The jury were empannelled on Tuesday of the second week of the term, and on Saturday afternoon the case was submitted to them, and they retired to make up their verdict, and not being able to agree, the Judge on Saturday night, shortly before 12 o'clock, continued the Court, by adjournment, until Monday, and on Monday, the jury being still unable to agree the Court was continued until Tuesday, and from Tuesday until Wednesday, when they returned a verdict of guilty, according to the charge in the bill of indictment.

There was a motion for a new trial. Motion overruled. Judgment of death was pronounced by the Court, from which defendants appealed.

In this Court there was a motion for arrest of judgment.

*Attorney General* and *Coleman* for the State.
*M. Erwin* for defendants.

PEARSON, C. J. The main question in this case is, had the Judge the power to keep the jury together, until Wednesday of the third week, and then take their verdict, and give judgment against the prisoners?

This depends upon the question, had the General Assembly the power to enact "in case the term of a Court shall expire while a trial for felony shall be in progress, and before judgment shall be given therein, the Judge shall continue the term as long as in his opinion it shall be necessary for the purposes of the case." *C. C. P.,* sec. 397.

The want of power in the General Assembly to make this enactment is put on Act IV, sec. 12, "The State shall be

divided into twelve judicial districts, for each of which a Judge shall be chosen, who shall hold a Superior Court in each county in said district, at least twice in each year, to continue for two weeks, unless the business shall be sooner disposed of."

The power of the General Assembly can only be restricted by an express provision of the Constitution, or by a necessary implication from its provisions; if the terms had been "to continue for two weeks and *no longer*," the restriction would have been express.    But no such words are used, and we are at a loss to conceive of any ground for an implication, that a term of the Superior Court should under no circumstances exceed two weeks.    On the contrary it is obvious that the duration of two weeks for a time in each county is fixed on, merely to provide for a consecutiveness in the beginning of the terms in the several counties of the district, for the return of process, &c., leaving it to the General Assembly in case of urgency, to make a partial interference with this general arrangement to effect the purposes of justice.    That such was the purpose, will appear by reference to sec. 13.    "Until altered by law, the following shall be the judicial districts, &c."

So there is no implication beyond that of making an arrangement of districts, and in our opinion the General Assembly had power to make the enactment under consideration.

As to the evidence:

1. The statement of the witness Polly Weston in regard to the manner of the killing of the deceased Steadman, for which the persons were on trial, could not in any way have been disconnected from the circumstances under which the others were killed and she was brutally injured; this is manifest from her statement, which the reporter will set out, and admits of no further discussion.

2. The testimony of Mrs. Williams, as to what Polly Weston said the morning after the tragedy, and among other things that she said "she wanted to tell Mrs. Morgan all about it, and who did it, before she died, as she expected and believ-

ed she would die," was competent in corroboration, and the fact that the woman believed she was at the point of death, made her declarations the more impressive, which surely could furnish no ground for their exclusion. It was the ill fortune of the prisoners, that this additional fact made the evidence more telling against them.

3. The testimony of the witness Haws as to the narrative of Polly was properly received; the circumstance that he afterwards wrote it down, did not affect its competency, and his writing could only have been referred to, for the purpose of refreshing his memory, and was properly treated as a mere memorandum.

4. The fact that Govan Adair was present and heard what his father said, and saw his confusion when told that Polly Weston was not dead, was admissible as a circumstance in corroboration. *State* v. *Smith.* The facts under which it occurred do not bring it within the provision, that after the committing magistrate has examined the prosecution and the witnesses in the presence of the prisoner, he shall take the examination of the prisoner, who shall be first warned as to his rights—what was said and done before Hanes, had no greater or other effect, than if it had occurred in the presence of any other person. The denial of Govan Adair of all connection, &c., and his silence, were subject to no more restraint, and were as free and voluntary as if Hanes had not been a magistrate. His purpose with the *posse* was to make the arrest and not to take the examination of the prisoner.

As the jury was not empanelled and charged with the case, it was within the discretion of His Honor to allow the State the benefit of a challenge "for cause," so as to secure a jury indifferent, as between the State and the prisoners.

This will be certified to the end, &c.

PER CURIAM.                    Judgment affirmed.