### THE STATE v. GEORGE BEST.

*Evidence—Expert—Poison—Trial—Verdict, how impeached—Jury, polling.*

1. Upon the trial of an indictment for homicide, charged to have been produced by poison, it was in evidence that the deceased exhibited, before and after death, symptoms of arsenical poison ; that flour, bread and dough, from which she had eaten had been taken, on the day of her death, from her house and given to the coroner who, with another physician—both being medical experts—made an analysis and testified that they discovered the presence of arsenic. The coroner testified that he carried the substance given him to his private office; that it was possible for some one to have entered his office and put in the poison, but barely probable : *Held,* not error to admit the evidence of existence of arsenic, especially as the Court instructed the jury that before they could consider that fact they must be satisfied beyond a reasonable doubt that the flour and dough analyzed were the same of which deceased ate.

2. When a motion for a new trial is based upon affidavits, the Supreme Court will not look into them ; the Court below must find the facts and spread them upon the record.

3. It is not competent to impeach the verdict of a jury for misconduct by evidence proceeding from the members of the body.

4. Where several jurors made affidavit that they were induced to join in the verdict of guilty in the belief that the recommendation of mercy accompanying their verdict would prevent the death penalty, and the Court permitted the affidavit to be filed, but, in the exercise of its discretion, declined to grant a new trial : *Held,* not to be error.

5. It is the privilege of one on trial for crime to have the jury polled when rendering the verdict ; but it is not error to receive the verdict without polling unless the defendant requests it in apt time.

INDICTMENT for murder, tried at Spring Term, 1892, of Craven Superior Court, before *Winston, J.*

There was but one exception to evidence. The testimony offered by the State (there was none on the part of the prisoner) tended to prove, by circumstantial evidence, that the

deceased, who was the wife of the prisoner, came to her death from the effects of arsenical poison placed in the flour which was used by her in the preparation of dinner for herself and other members of her family; that the poison used was an article called " Rough on Rats," and was placed in said flour by the prisoner with felonious purpose.

One Emperor Rouse testified that he went to the house of the prisoner the day after the death of the deceased, and there he found bread and flour; the flour had been mixed with water. Witness got it, put it in a paper sack and gave it to Dr. Primrose, the coroner, who came on Thursday, two days after the death of deceased, to hold an inquest. Witness found something soft in the sifter which looked like wheat bran, but was not. Witness gave it all (the bread, the dough and the soft stuff) to Dr. Primrose, the coroner, next day after he found it.

Dr. Primrose, who was admitted to be an expert, testified, among other things not necessary to be stated in order to point the exception, that the bread, the dough and the flour were given him the same day he went up there by Emperor Rouse. Witness took the bread, put it in his hand satchel and carried it to his office, and then to the drugstore and examined and tested it; it was the same bread, dough and flour, and was in the same condition as when witness first got it. No change in it. " Objection by the defendant as to the things found in the bread, etc., and exception."

The witness then testified that the bread contained arsenic, a poison that would produce death, but he could not say how much arsenic was in it; that the bowels and intestines of deceased were both inflamed; that indicates an irritant of some kind. Arsenic would produce such an effect; also a spot in the stomach that indicated deeper inflamation, indicated irritant poison of some kind. " Rough on Rats " is an arsenical poison. The witness testified at length on cross-examination as to the manner of his analysis of the bread

and dough, and his finding arsenic therein, also in the stomach ; and of his application of his test to "Rough on Rats" with the same result as his test of the bread and dough.   He testified that the bread and dough were kept in his private office; that it was possible for some one to have gone into his office and put arsenic in the bread, but it is barely probable. Witness testified further, that he made a second test of the bread and dough just before the term of the Court, "that the second test produced better results than the first—he accounted for this because the bread and dough had been in solution since the first test, and the arsenic had more time to dissolve."

Dr. Francis Duffy, a witness for the State, testified, after he was admitted to be an expert, that he examined the bread and dough in Dr. Primrose's possession ; he explained the tests applied by him ; that the test made in February did not produce results fully satisfactory, "but in our last tests they were decidedly plainer; this came about because of the insolubility of the arsenic in the water, and the second time we got more arsenic in a given quantity of water."

The only exception to the admission or rejection of evidence was that the Court admitted the testimony of the medical experts as to the poison found in the bread and dough.

It was a case of circumstantial evidence, this circumstance of the bread and dough being found at the house where the prisoner and deceased had lived, on the day after the alleged homicide, the application of the tests by experts and the finding of the poison, was relied upon by the State as one of material facts necessary to be proved in its evidence.

*The Attorney General,* for the State.
*Messrs. Caho & Lee* (by brief), for defendant.

MACRAE, J., after stating the case, proceeded : We can see no error in the admission of the testimony objected to, espe-

cially when taken in connection with the charge of his Honor to the jury, for he instructed them that before they could consider the testimony of the experts as to the analysis of the bread, flour and dough at all they must be satisfied beyond a reasonable doubt, that the bread, flour and dough analyzed were parts of the same of which deceased ate, and that caused her sickness and death, the same that Emperor Rouse gave to Dr. Primrose, and that it had not been tampered with in any respect, nor any poison placed in or upon it after it came into the hands of the witnesses and before the same was analyzed ; and the jury may consider, and it is their duty to consider, that the bread, etc., was not sealed up, but was placed in the hand-satchel and there remained sometime before it was analyzed."

In other parts of his charge the presiding Judge had fully left to the jury to pass upon the truth of all the evidence of the witnesses, and there was no exception taken to the charge.

The prisoner's counsel presented the following prayer for instruction, which was declined, and the prisoner excepted :

" 1. That in that there is no evidence to show where Susan Croom procured the flour and bread which Emperor Rouse testified that he delivered to Dr. R. S. Primrose, the jury shall not consider the evidence admitted on this point."

By a careful perusal of the testimony as set out in the " case " we are unable to find anything to indicate that Susan Croom, another witness, had any connection with the finding of the flour, bread, etc., by Emperor Rouse, as testified to by said Rouse, and therefore we must conclude that the presiding Judge was warranted in declining to give the instruction asked.

The day after the jury had returned the verdict set out in the record, which was in the presence of the prisoner and his counsel, the prisoner's counsel moved the Court to set the verdict aside, and stated that they proposed to offer the

affidavits of some of the jurors who tried the case, as a ground for such motion.

To this the Court remarked that the uniform custom with the courts of our State was not to hear a juror attack or explain the reasons for his action while serving as a juror, and that the action of the Court upon said motion was purely discretionary. To this ruling the defendant excepted. Thereupon the defendant asked leave to file, and did file, an affidavit of five of the jurors that the State had failed to prove that the defendant had put the poison in the bread that deceased had eaten, and that they were not satisfied of his guilt; that they agreed to the verdict of "guilty" of murder on condition that the prisoner be recommended to the mercy of the Court, and that they thought such recommendation would save the prisoner from the death penalty; that they were led to such belief from the fact that several days before, a jury, in a case in which a defendant was convicted of carrying a concealed weapon, was informed by the Judge that when they recommended the defendant to the mercy of the Court, that such recommendation would be considered; that the jury remained out all night, the room in which they were was small, and that these facts hastened their verdict."

The Solicitor filed the counter-affidavit of five other members of the jury, which is not necessary to be here set out.

"The Court, in its discretion, declined to interfere with the verdict, being fully satisfied that the defendant had had a fair and impartial trial at the hands of the jury, defended as he was by three able, zealous attorneys of this Court." The prisoner excepted.

We may consider together the two preceding exceptions, based upon the refusal of the presiding Judge to set the verdict aside upon the motion of prisoner's counsel, and the affidavit offered in support of the motion.

It was said in *State* v. *McLeod,* 1 Hawks, 344, that " As to the misconduct of the jury it has been long settled, and very properly, that evidence impeaching their verdict must not come from the jury, but must be shown by other testimony." This has been followed by an unbroken line of decisions, in both criminal and civil actions, down to *Hinson* v. *Powell,* 109 N. C., 534, to the same effect; notably in the case of *State* v. *Smallwood,* 78 N. C., 560, where it is said by BYNUM, J.:

"1. When a motion is made in the Court below to set aside a verdict upon the ground of improper conduct in the jurors, and the motion is founded on affidavits, the Supreme Court will not look into the affidavits. They can only decide upon the record presented to them, and, therefore, if such motion is designed to be submitted to their revision, the facts must be ascertained by the Court below and spread upon the record. That has not been done in this case. *State* v. *Godwin,* 5 Ired., 401; *Love* v. *Moody,* 68 N. C., 200 ; *Rineheardt* v. *Potts,* 7 Ired., 403.

" If the motion for a new trial is based, not upon the misconduct but upon the mistake of the jury in the Court below, the Supreme Court cannot take notice of such mistake, whether they find against the facts or the law, because the jurisdiction of this Court is confined to matters of law adjudged by the Court below; and to ascertain what matters of law were so adjudged, we look to the case stated. This Court corrects errors of law committed by the Judge below, and not those committed by the jury. For errors of the latter kind, the remedy is for the Court below to grant a new trial. *State* v. *Gallimore,* 7 Ired., 147 ; *Long* v. *Gantley,* 4 Dev. & Bat., 315; *Goodman* v. *Smith,* 4 Dev., 459; *Reed* v. *Moore,* 3 Ired., 313.

" 2. Misconduct on the part of the jury, to impeach their verdict, must be shown by other testimony than their own. This has been long settled for the most convincing reasons,

which will readily suggest themselves to all minds at all familiar with the administration of justice through the medium of trial by jury. *State* v. *McLeod,* 1 Hawks, 344."

To meet the earnest contention of the prisoner's counsel that the presiding Judge, having permitted the affidavits to be filed, ought to have found the facts and spread them upon the record, it appears that the affidavit offered alleges, or was intended to allege, that the affiants had agreed to the verdict of guilty through mistake in their understanding of the effect of the verdict. In this event, as has been said above, the Supreme Court cannot correct errors committed by a jury; this is the province of the Judge below, and therefore it was unnecessary for his Honor to find the facts upon the affidavits. But it might well be held that the affidavit, if we were at liberty to consider it, alleges misconduct upon the part of the five jurors making it, for if they were not satisfied by the evidence of the guilt of the prisoner, it was a gross wrong in them, for any consideration of personal inconvenience, to compromise with the other members of the jury and agree to a verdict of guilty, with a recommendation to mercy, in the hope that the life of the prisoner would be spared at the cost of a long imprisonment. If they were not satisfied of the prisoner's guilt, the only verdict they could conscientiously render would have been one of not guilty. And if the ground of the motion was the misconduct of the jurors, it should, as we have seen, have been based upon other testimony than the affidavits of the jurors who alleged their own misconduct, for they cannot be heard, and no facts could be found by the Judge below upon their affidavit.

The prisoner's counsel excepted because the jury were not polled upon the rendition of their verdict, and further, because the jury were not asked to explain their verdict. It appears, by the case stated, that the prisoner and his counsel were present at the rendition of the verdict, and did not ask

that the jury be polled, nor did they ask the Court to inter-
rogate the jury concerning the verdict.

It was not essential to the validity of the verdict that the
jury should be polled; it was the privilege of the prisoner to
have it done if he desired. *State* v. *Jones*, 91 N. C., 654;
*State* v. *Toole*, 106 N. C., 736. And it would not have been
proper for the Judge below, even if requested to do so, to
have questioned the jury upon their verdict.

The verdict was guilty. The recommendation to mercy
was not a part of the verdict, but an expression of sympathy
for the prisoner and of a desire on the part of the jury that his
punishment might be mitigated from the extreme penalty
of the law. Such recommendations, even in capital cases,
are not unusual, and in this case it was not, in our opinion,
calculated to put the presiding Judge upon inquiry whether
the verdict was unanimous. In the able and earnest argu-
ment of the counsel for the prisoner the precedent is admitted,
but we are exhorted to vary from it in this instance and estab-
lish a new one for our future guidance. The opinion to which
we are referred in support of this plea for a new precedent, in
*State* v. *Holt*, 90 N. C., 753, upon examination, will be found
to be a manly assertion of the right of trial by jury without
impairment by novel refinements, and an admonition to stand
upon the ancient ways lest we should establish precedents, the
result of which may "in some emergency overturn principle
and subvert the rights of many people."

We find ourselves concluded by the authority of an estab-
lished and long-settled rule based upon the wisest reasons of
public policy, that a juror should not be permitted to impeach
his own conduct in the rendition of a verdict. The result of
a departure from the old rule would unsettle other important
principles, protract litigation, and weaken the public regard
for the ancient and well-tried methods of trial by jury.

We cannot assent to the suggestion that the verdict of the
jury was not in accord with the spirit of the Constitution

(Article I., § 13) that " No person shall be convicted of any crime but by the unanimous verdict of a jury." The verdict was unanimous; it was rendered after long consideration; it was warranted by the evidence, and while public policy forbids that it shall be attacked in the manner proposed, the all-sufficiency of the law most wisely provides relief in worthy cases, where, by reason of human imperfection, there has been a miscarriage of justice to anyone's prejudice by the exercise of executive clemency.

Appreciating the gravity of the consequences of our conclusions in this matter, we have given it the most serious consideration, and having carefully examined the record, we are constrained to say there is no error. The judgment must be                    Affirmed.