STATE v. EDWARD J. FULLER.

*Murder—Jurors—Peremptory Challenge by State—Misconduct of Jury — Discretion of Trial Judge — Indifferent Juror— Failure of Judge to Exercise Discretion on Ground of Lack of Power—New Trial—Presumption of Premeditation from Use of Deadly Weapon.*

1. Under section 1200 of *The Code* it is error on the trial of capital cases to permit the State to peremptorily challenge a juror after he has been passed by the State and tendered to the prisoner. (CLARK, J., dissenting).

2. The discretionary power of the trial Judge in respect to challenges of jurors is confined to challenges for cause, and he has no more authority to extend the time for making peremptory challenges beyond the limit fixed by section 1200 of *The Code* than he has to allow more than four of such challenges. (CLARK, J., dissenting).

3. Where the trial Judge found the facts in regard to the alleged misconduct of the jury his refusal of a new trial on that ground is not reviewable in this Court.

4. Where a trial Judge rests his refusal to exercise his discretion upon the mistaken opinion either that it is not vested in him or that the facts are not such as to call for its exercise, it is error; therefore,

5. Where, in a trial for murder, a juror upon his *voir dire* swore that he had neither formed nor expressed an opinion as to the guilt of the prisoner and was accepted and, after verdict and upon motion for a new trial, it appeared from affidavits that such juror had declared that, if summoned on the jury, he would hang the prisoner, and the trial Judge refused the motion because "the affidavits were not sufficiently strong": *Held*, that this was a refusal to exercise the Court's discretion on the ground of a lack of power and was, therefore, erroneous. (CLARK, J., dissenting).

6. The use of a weapon likely to produce death raises a presumption of malice only, and not of premeditation and deliberation. (CLARK, J., dissenting).

7. Where a trial Judge, in defining two degrees of murder, inadvertently instructed the jury that the fact of killing with a deadly weapon, when admitted, raised the presumption or justified the inference that there was premeditation instead of malice, it was an erroneous instruction that could not be cured by any subsequent proposition that did not clearly remove from the minds of the jury the impression created by such instruction. (CLARK, J., dissenting).

INDICTMENT for murder, tried before *Bryan, J.*, and a jury, at Fall Term, 1893, of CUMBERLAND Superior Court.

The exception to the ruling of the Court permitting the State to challenge a juror, who had been tendered to the prisoner, appears in the opinion.

The prisoner presented affidavits, charging improper conduct on the part of the jury and of the officer who had them in charge, and showing, or tending to show, bias on

the part of J. C. Tew, one of the jurors, and from said affidavits the Court found the following facts:

"That eleven of the jurors were shaved by one of their number in their room on Saturday evening, the third day of the trial, and the other (a colored man) was carried to a barber-shop in town about two hundred yards from the room in which the remaining eleven jurors were. The officer, locking the door of said room, put the key in his pocket and accompanied the colored juror to the barber-shop and back, and when he returned found everything as he left it. They were supplied with two quarts of whiskey on Saturday afternoon. One quart was bought for Sunday, the jurors themselves furnishing the money and the officer buying it for them. Every juror drank out of it; each juror took one drink, consuming one quart. One quart was first bought, and some time after, same afternoon, the other quart. The jurors played cards from time to time pending the trial, the cards being furnished by the proprietor of the boarding-house. The friends of the deceased had been boarding at the house to which the jury were carried, but they did not remain there after the jury were carried there. That on another occasion the officer took one of the jurors, who was troubled with his bowels, to a back lot to obey a call of nature, and at the request of the juror, who was complaining of pain, carried him into a saloon, where the juror and officer each took a drink with him—the remaining eleven being left in the room and the same locked up; that on another occasion one of the jurors requested the officer to take him to a livery-stable not far off in order to remove his horse to another stable, and the officer did so, and also allowed the colored juror to go with them, leaving the other ten jurors locked up in the room until they returned; that the officer allowed the jurors to

use and read the *Wilmington Messenger* from day to day during the trial, which contained what purported to be a full report of the evidence and abstracts of the argument of counsel, instructing them not to read the account of the ‘Fuller’ trial; that on the night before the verdict was rendered the jury, without the knowledge or consent of the prisoner or Court, were taken by the officer to a prayer-meeting in the Baptist chuch; that they sat together, the officer sitting with them, and all in his immediate view, and that there was nothing improper in their conduct while at church, going to or from.

"The above facts are found by the Court upon the affidavits filed by the prisoner, and the affidavit of E. M. Waddell, the officer of the jury, which he filed in answer to the rule served upon him for contempt, in violation of his duty as such officer, and which he asked might be read in response to the affidavits as to his conduct.

"It was agreed between counsel on both sides that the officer might take the jury to church on Sunday, which he did. This is the only agreement made by counsel as to the jury. (Signed) HENRY R. BRYAN,
*"Judge Presiding."*

"The officer, answering a rule, was fined by the Court one hundred and fifty dollars, and sentenced to jail for thirty days. Upon the sworn testimony of his physician that imprisonment would imperil his life, he being an old and feeble man, and further testimony of his not having over fifty dollars in property, the fine was stricken out and the judgment suspended.
" (Signed) HENRY R. BRYAN,
*"Judge, etc."*

Facts found by the Judge and his ruling thereon entered of record :

STATE *v.* FULLER.

"One of the jurors, J. C. Tew, having been asked the question whether he had formed and expressed the opinion that the prisoner at the bar was guilty, answered in the negative, and was thereupon accepted.

"The prisoner, after the verdict, offered the affidavits of S. C. Godwin and J. R. West tending to show that the juror had expressed an opinion, which affidavits were as follows:

"S. C. Godwin, being duly sworn, says: 'That on Monday, January 22, 1894, late in the afternoon, affiant had a conversation with J. C. Tew and J. R. West relative to the trial of the Fuller case, in which conversation affiant asked said Tew (who was one of the jurors who tried the case) and West, 'What are they doing in the Fuller case?' to which West said, 'They are doing nothing.' Affiant then asked them if they were summoned on the *venire*, or if the *venire* was summoned, to which West replied, 'No, and they had better not summon us unless they want him (Fuller) hung, had they, John Curt?' (addressing Tew). J. C. Tew then said, 'You bet not.'

"J. R. West, being duly sworn, says: 'That on Monday of the first week of this term of the Court he was at the house of his uncle, S. C. Godwin, in Flea Hill Township, Cumberland county, in company with the said J. C. Tew, one of the jurors in the above entitled case; that the subject of conversation was the Fuller trial. S. C. Godwin asked if they had summoned the *venire*. This affiant said, 'No, they had done nothing with him yet, and they need not summon me and Tew, because we would hang him; would not we, Tew?' Whereupon the said Tew said, 'You bet we would,' or words to that effect."

"Upon which foregoing affidavits prisoner asked the Court to find that the juror Tew was not an indifferent juror at the time he was accepted by the defendant. The Court

declined so to find, being of the opinion that the affidavits were not sufficiently strong.

"(Signed)      H. R. BRYAN,
"*Judge, etc.*"

The single exception to the charge which is discussed in the opinion is set forth therein in full. From the judgment pronounced upon a verdict of guilty the prisoner appealed.

*The Attorney General* and *Mr. T. B. Womack,* for the State.
*Messrs. R. H. Battle, Geo. M. Rose, C. M. Cooke* and *W. W. Fuller,* for the prisoner (appellant).

AVERY, J.: After all of his peremptory challenges had been exhausted the juror Hawley was passed by the State and tendered to and accepted by the prisoner. As the Clerk was about to swear him he asked to be excused upon the ground that he was an intimate and life-long friend to the prisoner and connected with him by marriage. Further investigation developed the fact that no relationship either by consanguinity or affinity existed between the prisoner and the juror, but that a first cousin of the prisoner had married the juror's second cousin. After correctly ruling that no sufficient cause of challenge had been shown, and after it had been made to appear that the juror had previously asked the counsel for the prosecution to excuse him, but without assigning any reason for making the request, the Court overruled the objection of the prisoner and permitted the State to challenge the juror peremptorily.

The statute (*The Code,* §1200) provides that "in all capital cases the prosecuting officer on behalf of the State shall have the right of challenging peremptorily four jurors; provided said challenge is made before the juror is ten-

dered to the prisoner, and if he will challenge more than four jurors he shall assign for his challenge a cause certain." The right of peremptory challenge is given to the prosecuting officer, coupled with the express condition that it is to be exercised before the particular juror is tendered to the prisoner, or not at all. The statute imposes no such restriction as to challenges for cause. *State* v. *Vestal*, 82 N. C., 563. Hence, where a juror is tendered to a prisoner and on *voir dire* states that he had formed and expressed the opinion that the prisoner is not guilty (*State* v. *Jones*, 80 N. C., 415), or where even after he is both tendered and accepted he then, on coming to the book to be sworn, states that he is related to the prisoner within the ninth degree (*State* v. *Boone*, 80 N. C., 461), in either case, the Court unquestionably has the power to allow the challenge for cause. For the same reason where the fact of killing was admitted and a prisoner charged with murder relied upon insanity as a defence, the Court had the power to permit the State to challenge a juror who after being accepted stated that he was firmly fixed in the opinion that the prisoner was insane at the time of the killing, and that this belief could not be removed by hearing any amount of evidence. *State* v. *Vann*, 82 N. C., 631. Where a prisoner charged with homicide has accepted a juror, and before the jury is impaneled, the *nisi prius* Judge, acting as a trier, ascertains that the juror has formed and expressed the opinion that the prisoner is not guilty, it is within his sound discretion to allow or disallow a challenge for such cause, and his ruling is not reviewable, as it is not in any such case of challenge to the favor. *State* v. *Green*, 95 N. C., 611. Had the juror Hawley stated that he was related to the prisoner within the ninth degree, sufficient cause of challenge would have been shown (*State* v. *Perry*, Busbee, 320, and *State* v. *Potts*, 100 N. C., 457), and the exception to the

ruling of the Court would have been groundless.   But the statute defines in plain and unequivocal terms the limit to the right of objection on the part of the State without assigning cause, and fixes unmistakably the extent of time within which it is to be exercised.   None of the authorities cited for the prosecution extend the right of peremptory challenge beyond the time of tendering the juror to the prisoner, and if this Court had inadvertently made a ruling so plainly repugnant to and subversive of the provision of the statute, it would have been hard measure to adhere to such a precedent where human life is involved.   The discretionary power of the Judge was confined to challenges for cause.   He had no more authority to extend the time for making peremptory challenges beyond the limit fixed by the statute than he had to increase the number allowed to the State beyond four.   The question of the proper interpretation of the language of the statute is one for this Court, and its meaning seems so plain as to require but little further discussion of this exception, after showing that it has never received a construction different from that which we now place upon it.   After the juror had been tendered it was the right of the prisoner to demand that he be sworn, unless the challenge had been allowed for cause and not peremptorily on behalf of the State.

After the rendition of the verdict affidavits were filed tending to show misconduct on the part of the jury actually impaneled and of the officer who had charge of them. The Judge found the facts bearing upon this subject, and his denial of the motion on that ground is not reviewable here.   *State* v. *Best,* 111 N. C., 643.   But two affidavits were filed tending to show that one of the jurors who was chosen (John C. Tew) declared on his *voire dire* that he had not formed and expressed the opinion that the prisoner was guilty, whereas before he was summoned on the special

*venire* he had said in effect that it would not be well to choose him as a member of the jury, as he would hang the prisoner.    When the affidavits were offered his Honor seems, either of his own motion or at the request of counsel, to have entered on the record proper a statement of the action taken in reference to them.    After reciting that the affidavits relating both to the misconduct of the jury and the bias of the juror Tew, and finding the facts and entering his judgment upon the motion for a new trial in so far as it was founded upon such alleged misconduct, his Honor proceeded to find and enter upon the record proper the finding that Tew had declared on his *voir dire* that he had not formed and expressed the opinion that the prisoner was guilty, he was chosen and sworn as a juror, the Court proceeded to pass upon and enter of record its action on the other branch of the motion for a new trial and to refuse to find that Tew was not an indifferent juror, because the "foregoing affidavits" (those of West and Godwin, which were evidently spread upon the record as exhibits) were "not sufficiently strong."    Instead of questioning the credibility of the affiants or stating broadly that, in the exercise of the discretion vested in him, he refused the motion in so far as it was founded on the alleged bias of Tew because the affidavits were not sufficiently strong to produce belief in their truth, for credibility does depend upon the production of a strong but of an apparently truthful statement.    It is impossible to understand the order of the Court upon this branch of the motion for a new trial, the reference in it to the two affidavits recorded with it and the previous recitation that the Court started out to enter a finding as to the bias of one juror as well as the misconduct of the whole panel, unless we draw the natural if not irresistible inference that his Honor intended to find as a fact that the juror Tew declared that he had not formed

and expressed the opinion that the prisoner was guilty, and then, instead of eliminating the facts from the two affidavits or falling back upon his discretionary power, to hold as a conclusion of law that, conceding the truth of the allegations contained in the affidavits, they were not sufficiently strong to warrant the exercise of his discretionary power.    It is familiar learning that where a *nisi prius* Judge rests his refusal to exercise his discretion upon the mistaken opinion, either that it is not vested in him or that the facts are not such as to call for its exercise, it is error. The rule is so established, because a Judge acting under a misapprehension of the law might, in cases like that before us, refuse to follow the dictates of a sound discretion solely because he had been misled by an erroneous view as to his power.    If the motion had been refused on the uncontradicted affidavits without comment, or with the statement that it was denied in the exercise of a sound discretion, it would not have been reviewable.    *State* v. *Smallwood*, 78 N. C., 560.

It is immaterial whether the Court started out to find the facts at the request of the prisoner's counsel or on its own motion.    It would have been a work of supererogation to request the Judge to do what he was already doing voluntarily.    But the principle announced in the recent case of *State* v. *DeGraff*, 113 N. C., 696, and *State* v. *Best, supra*, must not be misunderstood.    If the Judge, of his own motion or on request of the prisoner's counsel, starts out with the avowed purpose of finding the facts, and then states as a conclusion of law that certain affidavits, if admitted to be true, are not sufficient to call for the exercise of his power, instead of eliminating the facts from the affidavits, it has never been held by this Court that a prisoner who is not in fault, under such circumstances, is precluded from excepting to a mistake of law made by the

Court as to the extent of its own discretionary power.   The
Judge might have found the facts from the affidavits or
other testimony in a very small compass; he might either
have declared his disbelief of them, or he might in a few
words have claimed the right to exercise a sound discre-
tion, despite the fact that they were filed.   He chose to do
none of these things, but to rest his ruling upon the idea
that the affidavits were not "sufficiently strong."   Suffi-
ciently strong to do what? except to accomplish the only
purpose for which they could have been filed—call for the
exercise of the sound discretion vested in the Court.   If
his Honor had meant he did not deem the affidavits credi-
ble, he would have pronounced them unworthy of belief,
not wanting in strength.   The affidavits might well have
been weak or strong, and yet scrupulously in accord with
the truth.   If counter-affidavits had been filed the Judge
would have so stated, and would probably have eliminated
his findings from all that were submitted.   The impression
that the Judge distrusted his power is strengthened by the
remark, subsequently made in the very moment of announc-
ing his conclusion, that he had never known of an instance
where a verdict such as this had been set aside.   If a
Judge is reluctant to pass upon the credibility of such affi-
davits, yet is unwilling to evade review by falling back
upon his discretion, can we deduce any rule or inference
from adjudicated cases that will prevent him from pursuing
a course which is so manly and which evinces so just an ap-
preciation of the gravity of the situation?   If his Honor
deemed the affidavits insufficient in law to evoke the exer-
cise of his power, it was just to the prisoner and creditable
to him to allow the case to be so fairly presented.   Sup-
posing it to be true, then, that Few, intending and desiring
to insist upon a verdict of guilty of murder in the first
degree, if selected as a juror, and to have the prisoner

hanged, which purpose presupposed either the belief that he was guilty or a corrupt purpose to punish him even if innocent, falsely declared upon his *voir dire* that he had neither formed nor expressed the opinion that he was guilty, and thereby contrived to have himself chosen, had the Court the power to set aside the verdict and grant a new trial? Where a juror fraudulently procures himself to be selected, and swears falsely that he has not formed the opinion that the prisoner is not guilty, the presiding Judge has the power, in furtherance of the duty which the law imposes upon him to see that all trials are fair and impartial, to order a mistrial after the jury has been impaneled on an indictment for murder. *State* v. *Bell*, 81 N. C., 591. And it is not material whether it appears in such a case that the fraud was practiced at the instance of or through the agency of the prisoner, or with his subsequent assent. It was held sufficient that he was about to avail himself of the benefit of it. *State* v. *Washington*, 89 N. C., 535; *Ibid.*, 90 N. C., 664. However rarely it may become the duty of a presiding Judge to exercise the power to grant a new trial where a prisoner is found guilty of a crime punishable with death, there can be no question as to its existence. Thompson & M. on Juries, section 302; *State* v. *Tilghman*, 11 Ired., 552. What is ordinarily left to sound discretion becomes a high duty when it is once conceded that justice has miscarried by the fraudulent contrivances of a juror in procuring his own selection by perjury. If it be true that the juror Tew was so full of prejudice as to declare in effect that if chosen he would endeavor to have the prisoner hanged, and that he afterwards imposed himself on the counsel as an indifferent juror, it is manifest that the trial of the prisoner, in so far as this particular juror was a factor in it, was a mockery of justice. If the affidavits were believed they unquestionably showed facts that justify the

setting aside of the verdict. It is true that we may expect
such evidence to be adduced often, when the presiding
Judge can from his stand-point see that it is not to be relied
upon, but in all such cases he has but to rest his decision
upon the sufficiency of his own power rather than the
insufficiency of the testimony to make it no longer the sub-
ject of review here. We do not hold, nor is it necessary
that we should decide, that evidence of fraudulent intru-
sion of such a juror into the panel, if believed, would
make it in all cases, even where there is no reasonable view
of the evidence consistent with the innocence of the pris-
oner, the imperative duty of the presiding Judge to grant
a new trial. If the affidavits, admitting their truth, were
sufficient to warrant the exercise of the discretionary author-
ity of the Court, the ruling was erroneous. We think that
if the fraudulent intrusion of a friend of a prisoner accom-
plished by swearing that he has never expressed the opinion
that the prisoner is not guilty is sufficient ground for a new
trial, the justice and reasonableness of the converse propo-
sition must be conceded also. The fact that an enemy has
contrived by perjury to get into the panel in order to con-
vict is sufficiently potent as evidence of injustice and wrong
to the prisoner to justify the Judge in setting aside the
verdict, in the exercise of the power entrusted to him to
meet just such extraordinary emergencies. We think, also,
that the first exception to the charge is well taken, and
must be sustained.

In defining murder in the first degree the Court said:
"The killing being admitted, and nothing else appearing or
proved, the Court charges you that no presumption is raised
that it is murder in the first degree, and unless the circum-
stances show beyond a reasonable doubt that there was a
deliberate, premeditated, preconceived design to take life,
it is murder in the second degree. The act should not only

57

be willful, premeditated, malicious, but it must have been committed with the formed intention to take life; a fixed design that the act shall result in the death of the party assaulted, a fully formed, conscious design to kill, and with a weapon prepared for the purpose. Premeditation may be inferred or presumed from the use of a deadly weapon in the possession of the party using it, unless the contrary be made to appear." The prisoner could not justly complain of the proposition embodied in all that precedes the last sentence of the foregoing extract from the charge. The mere fact of killing, when admitted, raised no presumption that it was murder in the first degree, and it was the duty of the jury, unless they were satisfied beyond a reasonable doubt that there was a deliberate, premeditated and preconceived design on the part of the prisoner to take life and that the act of killing was committed in pursuance of such fixed design, to find the prisoner guilty of no higher offence than murder in the second degree. When the jury were told that they were at liberty to presume or to draw the inference from the mere fact that a deadly weapon was used, leaving out of view any other evidence offered to show that the prisoner was in the very act of killing, pursuing a deliberate and preconceived purpose, a very grave question was raised, which it is the duty of this Court to settle in this the very first case involving a construction of the late act, defining what constitutes murder in the first and second degrees. Unquestionably now, just as before the enactment of the statute, the use of a weapon likely to produce death raises a presumption of malice, and therefore the jury may infer, when there is evidence that the killing was done with such a weapon, that the person charged is guilty of murder in the second degree. *State* v. *Townsend,* 66 Iowa, 741. But the use of a deadly weapon does not *ipso facto* bring a killing within the definition of a murder

"perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate or premeditated killing, or committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony," but relegates it as a merely technical murder, depending upon the artificial weight given to testimony, to the second-class.  Probably ninety-nine out of every hundred homicides are caused by the use of a deadly weapon, and if in every case where its use is provoked by insulting language (not deemed provocation in law) which is resented with fatal result on the spur of the moment, the offence is presumably murder, but little has been accomplished by the legislative attempt to classify cases which before fell within the definition of murder, and to subject to the death penalty only the more heinous offenders.  The Pennsylvania statute is substantially the same as ours, and by that statute the first classification of criminal homicides into two degrees of murder and manslaughter was made in this country.  2 Bishop Cr. Law, sec. 703.  Prior to the statute (says Bishop, sec. 726) every killing of "malice prepense" was murder.  "Since the statute, when to this another degree of malice is added, the particular killing becomes murder in the first degree, but when there is no such addition made it is murder in the second degree."  The intentional killing with a deadly weapon raised a presumption, not of premeditation or deliberation, but of malice only.  19 Am. and Eng. Enc., 65; *State* v. *Collins*, 8 Ired., 407; *State* v. *Willis*, 63 N. C., 26; *State* v. *Brittain*, 89 N. C., 502.  When, therefore, not only proof of malice, but of something more, was made requisite for a conviction for the capital felony of killing, the prosecution could no longer make out a *prima facie* case of premeditated and deliberate murder by evidence which gave rise to a presumption of the malice only.

Under the operation of the new law every slaying upon provocation deemed sufficient in law to arouse anger, and under the influence of the passion thus engendered, is manslaughter, though done with a deadly weapon.   But in the absence of such mitigating circumstances the law presumes malice from the manner of killing just as it did before its enactment.   The existence of malice, however, if admitted or presumed from the use of a pistol, does not of itself warrant the inference of premeditation, though the preparation and use of the pistol doubtless is evidence proper to be submitted with other facts and circumstances as tending to show the existence both of premeditation and deliberation.   "Where the act is committed deliberately with a deadly weapon," says Wharton, 2 Cr. Law, sec. 944, "and is likely to be attended with dangerous consequences, the malice requisite to murder will be presumed."   It has been held by the Supreme Court of Pennsylvania, construing the statute, re-enacted here almost *in totidem verbis* (*State* v. *Drum*, 58 Pa. St., 9), that while the use of a deadly weapon is *prima facie* evidence of malice, and while the fact that it has been intentionally used to inflict a mortal wound throws the burden upon the accused to show circumstances that will mitigate the killing to manslaughter, the presumption raised is no higher than that the homicide is murder in the second degree.   In order to constitute murder in the first degree there must be evidence of express as contradistinguished from implied malice.   "Any unlawful killing of a human being with malice aforethought is murder; but if nothing further characterizes the offence it is murder in the second degree; to constitute the higher offence there must be willfulness, deliberation, premeditation."   *People* v. *Cox*, 76 Cal., 285.

In the case of *Romans* v. *State*, 41 Wis., 312, the Court approved the instruction that the jury would find the

STATE *v.* FULLER.

defendant guilty of murder in the first degree if they should find from the evidence not only that he "shot deceased and thereby caused his death," etc., but provided, also, they should "believe from the evidence beyond a reasonable doubt that the defendant did the shooting with the premeditated design to kill the deceased." It must appear "not only that the defendant is guilty of feloniously killing the deceased, * * * but that such killing was done willfully, deliberately and with premeditation." Wharton's Law of Homicide, 368. Where the presumption of slaying with malice aforethought only is raised, the proof falls short of justifying the inference of guilt by failing to amount also to *prima facie* proof of premeditation and deliberation, which are essential elements of the higher crime. Wharton, *supra*, 369; *Green* v. *State*, 45 Ark., 281; *Atkinson* v. *State*, 20 Texas, 522. That a homicide may be willful in so far as the intent is evinced by the use of a weapon likely to produce death, and yet not deliberate or premeditated within the meaning of the statute, seems to be generally conceded by the Courts where the words of our statute have received an interpretation. *State* v. *Hill*, 69 Mo., 451; *McQueen* v. *State*, 1 Lea (Tenn.), 285; *Aveline* v. *State*, 64 Ind., 96.

Where the presiding Judge in defining the two degrees of murder inadvertently instructs the jury that the fact of killing with a deadly weapon, when admitted, raises the presumption or justifies the inference that there was premeditation instead of malice, it is necessarily an incurable error. No subsequent proposition inconsistent with that can be held to have removed the erroneous impression fastened on the minds of the jury in the beginning, but, while the Court reiterates in many forms the instruction that it is incumbent on the State, in order to a conviction of murder in the first degree, to show beyond a reasonable

doubt that there was both premeditation and deliberation, there is in fact nothing in the charge clearly inconsistent with the idea that the jury were still left to draw the inference that there was premeditation from the bare fact that a pistol was used by the prisoner to inflict the mortal wound.

The passage of the Act of 1893 marks an era in the judicial history of the State. As far as we can ascertain, every other State had previously divided the common law kind of murder into two classes. The theory upon which this change has been made is that the law will always be executed more faithfully when it is in accord with an enlightened idea of justice. Public sentiment has revolted at the thought of placing on a level in the Courts one who is provoked by insulting words (not deemed by the common law as any provocation whatever) to kill another with a deadly weapon with him who waylays and shoots another in order to rob him of his money or poisons him to gratify an old grudge. So long as artificial proof of malice is allowed to raise the presumption of murder this new law will fail to accomplish the object for which it was framed. Elsewhere the Courts have generally followed the lead of Pennsylvania, and we, too, have adopted the interpretation given by her Courts to the law which our Legislature has borrowed from her statutes. It is not the severity of laws, but the certainty of their execution, that accomplishes the end that should be always in view in enforcing them. Heretofore public opinion has approved and often applauded the conduct of juries in disregarding the instructions of Judges as to the technical weight to be given to the use of a deadly weapon. The consequence has been that a lax administration of the law being tolerated in such cases, other juries have constituted themselves judges of the law as well as of the facts, when proof has shown a more hei-

STATE *v.* FULLER.

nous offence. The experience of a few years will probably demonstrate here as elsewhere that fewer criminals will escape under a law which is in accord with the public sense of justice than under one which makes no discrimination between offences differing widely in the degree of moral turpitude exhibited. For the reasons pointed out the prisoner is entitled to a                                New Trial.

CLARK, J., dissenting: *The Code,* §1200 is unambiguous. It restricts the State as to its peremptory challenges so that they can only be demanded as a right before the juror is tendered to the prisoner. This section does not purport to be a restriction upon the Court in the exercise of its immemorial privilege and duty of permitting challenges or excusing jurors at any time before the jury is impaneled whenever this is required in the interest of a fair and impartial trial. It is certainly too late in this State to contest the settled principle that the defendant has the right to reject, not the right to select, a juror. In the present case no man sat on the jury to whom the prisoner objected. He has no just ground of complaint that one did not sit on the jury whom he would have wished to do so. The juror challenged himself. He said he was a life-long and intimate friend of the prisoner, and connected with him by marriage. An investigation of the latter statement showed that the connection by marriage was not such as in law to disqualify him. The relations of the juror with the prisoner were not previously known to the State. The State had not exhausted its peremptory challenges. The juror did not think he was an impartial juror, and challenged himself. The Court might well have excused him *ex mero motu.* It exercised its legitimate duty in permitting the State to peremptorily challenge him, when it had lost its *right* to demand to do so, by not exercising it sooner. In at least seven cases this Court has

held that the trial Judge may in his discretion permit a juror to be challenged by the State after he has been tendered to the defendant. *State* v. *Green*, 95 N. C., 611; *State* v. *Adair*, 66 N. C., 298; *State* v. *Jones*, 80 N. C., 415; *State* v. *Boon*, 80 N. C., 461; *State* v. *Vestal*, 82 N. C., 563; *State* v. *Vann*, 82 N. C., 631, and *State* v. *Cunningham*, 72 N. C., 469, and there are several others. It is true that in most, if not all, these cases the challenge was for cause. But the principle is exactly the same. As a matter of right the State can challenge neither for cause nor peremptorily after the juror is tendered to the prisoner. The allowance of any challenge to the State thereafter is not of right, but in the discretion of the Court. Such power is wisely vested in the discretion of the Court, as was said by PEARSON, C. J., in *State* v. *Adair*, *supra*, "to secure a jury indifferent as between the State and the prisoner." In *State* v. *Green*, *supra*, ASHE, J., calls attention to the fact that the challenge allowed the State after the juror was tendered "was not strictly a challenge for cause, but a challenge to the favor, which is when the party has no particular cause of challenge, but objects that the juror is not indifferent on account of some suspicion of partiality, prejudice or the like." That challenge was held to have been correctly allowed. That case is exactly the case here, only the State was more hardly dealt with here, in being required to exhaust one of its peremptory challenges. In the above cause the juror was stood aside for cause allowed in the discretion of the Court after he was tendered. It will be difficult to know what is the law applicable to the trial of capital cases if a principle heretofore settled by so many precedents is to be summarily swept aside. The juror properly challenged himself. He knew he ought not to sit on the case. The prisoner has no right to select any juror. His right lies solely in rejecting improper or objectionable jurors.

The juror, John C. Tew, on his *voir dire* swore that he had not formed or expressed the opinion that the prisoner at the bar was guilty. After verdict, when the jurors had been discharged, and doubtless had gone to their homes, an affidavit was filed by some one that Tew had made a different statement. The Judge stated that the affidavit was not sufficiently strong, and declined to set the verdict aside on that ground. The palpable meaning is that the affidavit was not sufficiently strong to convince him that Tew had foresworn himself. We do not know the character or credibility of the party making the impeaching affidavit. He may have been entirely unworthy of belief, or quite otherwise. But it rested with the presiding Judge to pass upon that. He did so. He said the affidavit was not sufficiently strong, and, as it did not satisfy him, declined the motion. This is, in effect, a distinct finding of fact. But it has been too recently decided by this Court in *State* v. *DeGraff*, 113 N. C., 688, affirming former precedents, to need discussion that, where the facts are not found by the trial Judge and spread upon the record, the affidavits of grounds for a new trial cannot be considered in this Court. If this ruling of the Judge was not a finding of fact that the affidavit was insufficient to convince him, we cannot consider the affidavit. *State* v. *DeGraff, supra.* If it was in effect such finding, the finding is conclusive. It would be a cruel misapprehension of the language of the impartial Judge who presided at the trial to construe him as meaning to find that the impeaching affidavit was true, that a juror had perjured himself in order to get upon the jury, but that such fact was not strong enough to warrant setting aside the verdict. The Judge does not find the impeaching affidavit to be true and insufficient, but he finds the affidavit not strong enough. This, coupled with his refusal to set aside the verdict, can mean but one thing—that he did not believe the

impeaching affidavit. It will be dangerous to act as juror in a capital case—always and to every one sufficiently unpleasant—if, after the juror has been discharged and gone home, the fact that some person can be found to file an affidavit that a juror had perjured himself on his *voir dire*, which affidavit the presiding Judge disallows and refuses the motion—if upon such facts a new trial can be obtained upon appeal on the ground that the juror had committed perjury. The presiding Judge did not so find. On the contrary, he refused the motion based upon such affidavit. There is certainly nothing in the action of the Judge which warrants the juror being pilloried for all time in the printed report of this case as having sworn falsely on his *voir dire* in order that he might convict a fellow-being of a capital offence, nor that the Judge held as a matter of law that such fact was insufficient to warrant a new trial.

Nor is there any error under our precedents in the charge of the learned Judge. The killing with a deadly weapon having been shown, the law presumes malice aforethought, as charged in the indictment. No other principle is more indisputably settled by all our authorities. Malice aforethought *is* premeditation. The Judge correctly told the jury that such malice or premeditation might be presumed or inferred from the use of a deadly weapon. The facts and circumstances in proof might mitigate the offence to murder in the second degree or to manslaughter, or to self-defence, but the burden was upon the prisoner to show the matters of mitigation or excuse, either by the State's evidence or by the evidence offered in his behalf. *State* v. *Rollins*, 113 N. C., 734, and numerous cases there collected.

There can be no discussion of the wisdom of the policy of dividing the crime of murder into two degree. The Legislature is the sole judge of that, and the wisdom of its

action cannot be called in question in this co-ordinate department, and, in fact, it has not been. That question does not arise. But in all cases, whenever the proof of certain facts raises a presumption and shifts the burden upon the defendant, the presumption is as to the offence with which the defendant is charged in the indictment, and not of an inferior offence. The indictment here charges the prisoner with the crime of murder in the first degree, not murder in the second degree. The prisoner under this bill can be found guilty of the felony whereof he stands charged, or of inferior degrees of it according to the proof, as murder in the second degree, manslaughter, assault, or he can be acquitted. But when the killing with a deadly weapon is shown the law presumes malice, and upon all our authorities the prisoner should be convicted (as the learned Judge charged) of the crime whereof he stands charged, unless he shows that state of facts which would mitigate the offence to an inferior offence, as murder in the second degree, or manslaughter, or self-defence, etc. In establishing the offence of murder in the second degree the Legislature did not intend to abolish the offence of murder in the first degree. It only meant that the offence should be mitigated to that if the evidence shows that the prisoner is entitled to the benefit thereof. The killing with a deadly weapon having been shown, the jury under all our precedents should have found the prisoner guilty of murder in the first degree, as charged in the indictment, unless matters were shown reducing it to a lesser offence. While the statute certainly creates the lesser offence of murder in the second degree there is nothing in the statute which intimates a change in the ancient and well-settled rule of law which raises a presumption of guilt as to the offence, murder as charged, from the fact of killing with a deadly weapon. Nor is there reason for the Courts to change a

rule founded in profound wisdom and so long and uniformly adhered to. Already in trials for homicide the State is at enormous disadvantage. While the law establishes an inferior degree of murder, there is no ground to render it more difficult for the State to establish guilt or to give added technical advantages in the trial to the defendant, which will virtually abolish convictions for murder in the first degree in all cases. The humanity of our law already gives the prisoner on trial for a capital offence every possible advantage consistent with the enforcement of the law. There is no reason they should be added to. He has twenty-three peremptory challenges, while the State has but four.

His guilt must be shown beyond a reasonable doubt. Twelve jurors must concur in finding him guilty. He has the great advantage that erroneous rulings of the presiding Judge, if in his favor, cannot be corrected, while a single erroneous ruling against him vitiates the whole proceeding. The sympathy of the jury in favor of a fellow-being in jeopardy of his life is easily appealed to and readily evoked. The legal technicalities of the trial are quickly availed of, if one is violated, by skillful counsel. Under these circumstances convictions for capital offences are rare, and more men each year suffer that punishment without process of law than by its authority. The executive and legislative departments of the Government strive in vain to prevent the growing lawlessness in that regard. Whether capital punishment should be abolished or not rests with the people acting through their accredited representatives. But as long as the penalty of death is denounced by the statute it should be borne in mind that a trial for a capital offence is a solemn, serious proceeding, which society has decreed as necessary for its safety and well-being. It is not to be approached from the sentimental or humanitarian side. The sole object should be the cold, impartial

ascertainment of the facts pertaining to the charge. When, notwithstanding the great advantages guaranteed the prisoner by the humanity of the laws and the humane interpretation and administration of them, both by this Court and by the humane Judges who administer the law in the Superior Courts—when, notwithstanding all this, the unanimous verdict of a jury has pronounced the prisoner guilty, and the Judge has overruled the exceptions in his favor, there is a duty which the Courts owe to society. The presumption in the Court below is in favor of the innocence of the prisoner. When that is overcome by verdict and judgment on appeal every presumption in this, as in all other cases, is in favor of the correctness of the proceeding below. That presumption has not been overcome. This Court rules only upon errors of law assigned in the rulings of the Judge. The rulings excepted to in this case are each and all sustained by ample authority, as above cited.

If there are matters outside of the challenged rulings of the Judge which make in favor of the prisoner, it is beyond the power of this Court to consider them. The prerogative of mercy is unlimited, but its exercise rests not here. It is entrusted to another department of the Government.