Nash, C. J.
 

 The prisoner is indicted for murder. On theMi trial below, three witnesses were sworn in behalf of the r State. The first was a young female, an inmate of the prisoner’s family, who stated, that, when she returned heme^ about twelve o’clock, from a neighbor’s, she found there, with the prisoner, a man who was a stranger to her, the deceased. The parties- remained together in the porch of the house, until near sunset, when she. heard loud and angry
 
 *191
 
 talking. The prisoner accused the deceased of having put counterfeit money on him, and immediately went out and took the,horse of the deceased, declaring he would keep him until he gave him good money. The deceased went towards Harris, declaring he would have his horse or take the'prisoner’s life. Harris ordered him to stop, and not touch the horse, or he would kill him, and called to his son, a small lad, to bring him his gun, which was done, and the deceased returned to the house. Harris loaded his rifle, and called to his wife to take care of his trunk. She answered from the room where it was, and prisoner called to the witness to come to him, which she did.
 

 When the witness went out, she found Harris approaching - the house, with the gun in his hands, and in passing, he observed,. “I am afraid that man will do me some private harm.” He went into the house, and she heard deceased say to him,“ Stop Harris and let me talk -to you,” and with these words she heard the gun fire. She went into the house and found the man dead, and Harris standing in the- door, between the largo and small room.
 

 The second witness was a Mr. Williams, who stated that, on the day after the homicide, he went to the prisoner’s house, where the following conversation took place between them.
 

 Witness asked the prisoner, “what does this mean?’’ Answer, “It’s done, and I am sorry for it, but it could not “ be helped.” Do you know who the man is ?” “I do not.” “ Where did you shoot him?” “I shot him in the body.” “ What did you do it for ?” “ For a certain provocation: “it will all be-right: it was in self-defence.” “Didyousec “ the man have any weapon ?” “I see you, but I don’t know “ but you may have some weapon. He, the deceased, had “ conducted himself, as I will not allow any man to do. in “my house, and, as no man should do, in a gentleman’s “house. He was loafing about here, and some one robbed my
 
 *192
 
 “ father’s house, and he might have been the man or one of “them.” “ You say he was loafing here, and yet you took “his horse, and sent him to Mebane’s, and sent word to “ Mebane that you would kill a man before sunset.” With this the prisoner got angry, and said, “ the man had passed “ a counterfeit $50 bank bill on him.”
 

 Mr. Mebano stated, that just before dark, on the day the homicide took place, the prisoner’s boy came to his house on the horse of the deceased, with a message from his master : He sent him back. Soon after the prisoner came on the same horse, and, being asked how he was ? answered, “ Well in body, but distressed in mind. I have killed a “man and don’t know who he is.” Witness replied, “that “is a pity, you have done wrong.” Prisoner answered, “ Damn him, if it was to do over, I would do it again ; I be-“lievel was justified.” Witness asked, “Did ho threaten “you.” “Yes; we had a game of cards, and he put a “ counterfeit fifty dollar bill on me. I took his horse, and “ told' him, if he did not give me good money, I would keep “ him. The man then said, he would have his horse, or be the “ death of me. I called my son John to bring my rifle. I “ loaded it, and told him to come on and see which would “ be killed first, and from that I shot him, I believe right “ through the heart.. I am on his horse now, and am not ■“ going to run. He is a damn fine horse, and paces like a “ top.” The name of the deceased was Winfree.
 

 His Honor, in opening his .charge, stated the law upon the subject of homicide in general, of which there is no complaint. The case then states that the defendant’s counsel insisted “ that this was ,a case of justifiable homi- “ cide — a killing in defence of life, or of an .actual robbing “ in the dwelling-house of the prisoner, or, at most, it was but “ a case of manslaughter; a killing under sudden passion, “ or heat of blood. That the deceased threatened the life
 
 M
 
 of .the prisioner; that he was a stranger and dealer in
 
 *193
 
 “ counterfeit money ; so that, under tbe circumstances, tbe “ prisoner believed bis life was in danger, or that tbe de- *“ ceased would do bim some great injury ; that, if mistaken “ in this, if tbe prisoner detected bim in tbe act of stealing ‘‘from bis trunk, being in bis dwelling-house, and after “ dark, be bad tbe right to kill bim. But, even if such was “ not tbe fact, but the prisoner believed such to have been “ tbe intention of tbe deceased, and acted on that belief, it “ would at most have been but manslaughter.” His Honor, “ upon this part of tbe defence, instructed tbe jury, “ that “ whenever there is a reasonable ground to believe there is “ a design to destroy life, or to rob, or to commit a felony, “ tbe killing of tbe assailant will be justifiable. But it is, for tbe jury and not for tbe prisoner to judge of tbe rea- “ sonable ground for apprehension, and whatever be may “ say,
 
 unless the jury think,
 
 from tbe testimony, tbe prisoner “ bad reasonable grounds for apprehending damage to his “ person or property, his defence must fail. Should the “ jury believe tbe prisoner detected tbe deceased in tbe act “ of robbing bis trunk, and thus killed him, they should ae-quit. So, if they should believe, tbe prisoner found tbe “ deceased, in such a situation, as clearly to have manifested ‘‘such purpose, they should convict bim of manslaughter,”
 

 In commenting on tbe testimony, bis Honor called the attention of tbe jury to tbe female witness, and observed: “It was for tbe jury to decide, whether or not'her testimony bad been given in that clear, distinct and intelligi- “ ble way, without bias or prejudice, so as to command their “ full and entire confidence.” He then pronounced upon tbe witness, a high eulogium as to her appearance, and closed “ by observing, “ that for
 
 himself
 
 be could but lament, that “ she bad not received a religious education, so as to have >“ made her an ornament to her sex, instead o,f tbe bumble
 
 M
 
 individual she appeared before them,”
 

 
 *194
 
 The first objection to the charge is, as to the prisoner' having reasonable ground to believe, that the deceased intended to take his life, or rob him. The prisoner’s counsel contended, that, if the prisoner was mistaken in believing that the deceased intended to kill or rob him;
 
 yet, if he believed
 
 his life was in danger, or he was in danger of being robbed, and acted on that belief, it would at most have been but manslaughter. His Honor laid down the law upon this subject, and stated, whenever there is reasonable ground to' believe there is a design to destroy life, to rob or commit a felony, the killing will be justifiable. But it is for the
 
 jury,
 
 and not the prisoner, to judge of the reasonable ground for the apprehension. We see no error in these directions. It is the course which that humane man and excellent Judge, Sir Michael Fostee, pursued in a case before him. A man was indicted for the murder of his wife. He had in the morning loaded his g\m, in the hope of finding some game: being disappointed, he discharged the load, and put the gun in a safe place. During his absence, a servant, without his knowledge, took the gun, loaded it, and went after some game, and while the prisoner was still absent, returned it to the place from which he had taken it, where the-prisoner found it, in all appearance, as he had left it. The gun was carried into the room where his wife was.’ He took it up, touched the trigger, the gun went off and killed his wife. “I did not enquire, says Justice Fostee, whether the poor man had examined the gun before he carried it home? (where the accident occurred;) but, being of opinion, upon the whole evidence, that he had
 
 reasonable ground
 
 to believe that it - was not loaded,
 
 I directed the jury, that, if they were of the same opinion,to
 
 acquit him. Foster 265, 1 Rus. on Cr. 541. In Mead’s case, Levin’s C. C. 164, the same course was pursued. Mead had, the day before the killing, been very badly injured and abused by a party of boatmen,, at Scarboro’, and was rescued from them by the police.
 
 *195
 
 When the latter were carrying him off, the boatmen called to him, that they would come that night and pull his house down. He lived about a mile from Scarboro’, and, in the middle of the night, a great number of persons came about his house, singing songs of menace, and using violent language, indicating they had come with unfriendly intentions. Mead, under an
 
 apprehension, as he alleged,
 
 that his life and property were in danger, fired a pistol, by which Lace, une of the party, was killed. Justice Holroyd, in charging the jury, instructed them, “ if
 
 you
 
 are satisfied there was •nothing but the song and no appearance of further violence, •if
 
 you
 
 believe that there was no reasonable ground for apprehending further damage,” &c. In each case, the existence of reasonable ground of belief was left to the jury. The charge in this case, then, is shown to be sanctioned by the highest authority. Roscoe’s Or. Ev. 646. It is also sanctioned by reason. The
 
 existence
 
 of reasonable ground is a matter of fact, to be determined by the jury. If the person charged with the homicide, is to judge for himself, whether this reasonable ground existed, the most atrocious murders may be committed with impunity.
 

 The prisoner says, he believed his life was in danger. Who can look into his heart ? If the
 
 law
 
 allows
 
 him
 
 to judge, who can contradict him. The circumstances are nothing; it is
 
 his belief
 
 that justifies him. The law is not so. It is only from circumstances accompanying the transaction, that reasonable ground can be ascertained, and of their bearing and influence the jury are the sole judges. The case of the State v. Scott, 4 Ired. 409, has been brought to our notice, and we have examined it with care. It does not conflict with the views here expressed. The objection was not taken in the Court below, and was not considered in this Court.
 

 The second reason assigned by the prisoner for a
 
 venire de
 
 novo, is, that his Honor violated the act of ’96, in express-
 
 *196
 
 mg an opinion as to tbe degree of credit to be given to the female witness. Upon this point,, we can derive no aid from English authorities. In that country, for all time, the Judges have exercised the power, to express to the juries, their impressions as to the evidence — a power shamefully and cruelly abused at different periods in the history of that country, and it still exists. The Legislature of ’96, aware of
 
 the
 
 abuses to which this power was exposed, declared, that no Judge, in delivering his charge to the petty jury, should express an opinion, whether a fact is sufficiently or fully found; such matter being the true office and province, of the jury. See Rev. Stat. ch. 31, sec. 136. We think this case is within the principle delivered by this Court, in the State v. Davis, 4 Dev. 612. It never can be error in a Judge, to charge that a fact is established, which is admitted by the parties, or acknowledged by them. In Davis’s case, the Judged who- tried the cause below, stated-to the jury “ that the prosecutor appeared to have given a very fair and candid statement; he seemed to be a creditable
 
 mam”
 
 this was said in the summing up. Exception was taken, that it violated the act of ’96. But this Court decided that there was no error, because the case stated,
 
 “
 
 the prosecutor and owner, who was a respectable citizen, gave a clear and apparently unimpassioned relation of the circumstances affecting the case.” The Court decided that there was no error, because they were facts which were stated in the case, and therefore admitted by the defendant. Here the case, which is in substance the prisoner’s bill of exceptions, states, that no exception had been taken to the testimony of the female witness, or the others. This we consider as admitting that she was credible, and her statement true, and it was no error in the Judge, to tell the jury that such was the fact, and if he chose to do it in his own way, the prisoner has no right to complain. It has done him no injury. See also State v. Miller, I Dev. and Bat. 500.
 

 
 *197
 
 If his Honor had said, in so many words, the evidence of this witness is not controverted at the Bar; it is therefore admitted to be true, — surely, under the authorities cited, there could have been no error. 'His remarks as to her appearance and demeanor at the bar, her capacity and opportunity to testify in relation to the transaction, were entirely within the scope of his authority, even if her testimony had been controverted. Under the circumstances, this was not called for, but did the prisoner no harm, and could not make that which was true, more true. The expression with which his Honor closed his remarks upon this part of the case, was but the expression of a very natural regret, that the witness did not possess those Christian virtues, so desirable in all, and so especially appropriate and beautiful in the female. We have considered this case, as in all others, particularly of its importance, with an anxious wish to secure to the. prisoner every right, guaranteed to him by the law in the judgment below.
 

 This opinion will be certified to the Superior Court of Person, to the end that it may proceed to judgment and sentence, agreeably to this opinion and the law of the State.
 

 Judgment affirmed.