STATE v. THOMAS SMITH.

(Decided October 31, 1899.)

*Homicide—Premeditation—Judge's Charge.*

1. Express malice, or hatred, as a motive for the homicide, from which premeditation could be inferred, can not be established by proof which directly established abject terror and fear on the part of the prisoner for his personal safety.

2. A charge to the jury injuriously affects the rights of the prisoner which directs their attention to a motive for the homicide which the testimony, in all its bearings, had not tended to prove.

3. Intemperate language on the part of the prosecution indicating passion towards the prisoner, although immediately withdrawn, deprecated, with a caution against repetition.

INDICTMENT for murder, tried before *Moore, J.,* and a jury at August Term, 1899, of the Superior Court of JOHNSTON County.

The prisoner was indicted for the murder of Charles Lewis Cawthorne, and was convicted of murder in the first degree.

The killing of the deceased by the prisoner with a butcher knife was conceded. The State insisted that the homicide was attended with such circumstances as evinced premeditation, and established a case of murder in the first degree. For the prisoner, it was insisted that the killing occurred through fright, occasioned by the conduct of the deceased and his associates, and was in self-defense.

The charge of the Court relating to premeditation in the killing, excepted to by the prisoner, together with the evidence upon which it was based, is fully recapitulated in the opinion. From the judgment of death the prisoner appealed to the Supreme Court.

*Messrs. Argo & Snow,* for appellant.
*Mr. Zeb. V. Walser,* Attorney-General, for the State.

MONTGOMERY, J., delivers the opinion of the Court.

CLARK, J., delivers dissenting opinion.

FURCHES and DOUGLAS, J.J., each deliver concurring opinion.

MONTGOMERY, J. The defendant was convicted of murder in the first degree at the August Term, 1899, of Johnston Superior Court, and upon sentence being pronounced, he appealed.

A recital of the substance of a considerable part of the evidence is necessary to an intelligible discussion of that part of the charge of the Court upon which, mainly, we have determined to grant to the prisoner a new trial.

At the time of the homicide, the prisoner lived near Selma, on a piece of land lying immediately on the public road. His house was a small framed one, fifteen or twenty yards from the road. He, with his wife, went into Selma about three o'clock, on the afternoon of the 26th of December, 1898, to arrange a Christmas tree. Between ten and eleven o'clock at night, he and his wife, both walking, left the town for their home; while the father and mother of the prisoner, riding in an ox cart, were just behind, returning to their home, also. A short distance out of the town the prisoner and his wife passed three persons who wore masks which concealed their features. They each had a woman's skirt, and one of them

was wearing his.   The three masked persons were Charles Lewis Cawthorn, Graham Garner and Thomas Winfrey. They had all been drinking and had a pint of liquor along with them.   During the day they had been shooting off fireworks in Selma, and upon being prohibited by the town authorities from further indulging in the sport, they determined to go out in the country that they might do so.   One of them, Winfrey, had in his pockets two loaded pistols—a Bull Dog, of 32 calibre, and a Harrington & Richards, of like bore.

In a short time after the prisoner and his wife had passed the three masked persons, the latter started on the road in the same direction in which the prisoner was going.   The masked persons were shooting off their fireworks and singing and laughing, one witness said they were "hollering" too, and firing the pistols.   When not far from the prisoner's house, a pistol shot was fired, which the prisoner said he heard.   The homicide occurred just at the prisoner's gate, and in the road. The evidence is contradictory as to what occurred then and there.

The evidence of the State tended to prove that the prisoner, armed with a dangerous knife, came from the house, after the discharge of one Roman candle, into his yard, and made a sudden and furious assault upon the three masked men, in which one of them, Cawthorn, was killed, and another of them, Winfrey, was dangerously wounded; that they had not stopped at the gate, but were passing on, and were merely Christmas revelers.

The evidence of the defense tended to show that the three men had stopped at the gate, discharged fireworks into the prisoner's yard and near his house, and had so frightened the prisoner that he was alarmed for his personal safety; that he took up the knife and went to the gate, whereupon he was

seized by the man who had the pistol, and who had thrust it into his face, and that he commenced to use the knife in self-defense.

Amongst other things, the Court charged the jury that: "If the assault was prompted by the occurrences of Wilmington, and the rioting at Selma, or either of them, this would be a circumstance from which the jury might infer premeditation on the part of the prisoner."

That instruction was so great an error, when considered in the light of the evidence, that a recital of the evidence, and the whole of it, on that point, will make that error manifest without any extended discussion of it, and we therefore give the *whole* of that evidence:

In his evidence Winfrey said he "carried the pistols because I thought something might happen to me. The white folks and negroes had been rioting in Selma that day. I was going to deliver one of the pistols to Charlie Roberts."

J. H. Parker testified that he was mayor of Selma (and to quote his language): "I saw some fighting and shooting fireworks that day; the white men were beating negroes; they were using Roman candles; a white man beat a negro with a stick; one man shot a negro with a rifle; did not see prisoner participating in the row, and did not hear him say anything about it."

J. T. Ellington, sheriff of the county, testified that the prisoner, after he had surrendered himself into his custody, said: "He had not been able to sleep, and had had a dream." The prisoner further said: "He had been reading about the Wilmington troubles, and thinking about them until he could not sleep, and that when he saw men in disguise he thought they had come to kill him."

Lawrence Smith, the father of the prisoner, testified that he "had never heard prisoner say anything about the Wilmington trouble."

The prisoner testified: "I was not mad because of what my wife told me, and because of what I had read about the Wilmington affair. My wife told me she saw someone shooting at Henry Richardson, and I said it was a shame." He further testified: "I then heard some shooting. I was scared. I was frightened because I heard shooting, and had heard that there had been a riot at Selma that evening."

The above is every word of the evidence in reference to the matters embraced in his Honor's charge, which we are considering. It is hardly necessary to add that that testimony did not justify the charge. The testimony, instead of furnishing evidence of malice or hatred against the white race or against those three masked persons from which premeditation to kill could be inferred, directly established abject terror and fear, on the part of the prisoner, for his personal safety. The charge must have had a most damaging effect upon the rights of the prisoner, for it directed the attention of the jury to a motive for the homicide, in the prisoner's breast, which the testimony, in all its bearings, had not tended to prove.

We will not consider the other exceptions raised on the appeal. While the record discloses that there was too much of passion on the part of the prosecution for the State, in the trial below, it further shows that that fact was acknowledged; and it may be expected that on the next trial the error will not be repeated.

Every citizen of North Carolina on trial for crime should feel, if he is really innocent, that he has nothing to fear, and in all cases that the prosecuting officer is not his enemy. There must be a

New trial.

CLARK, J., dissenting. I can not concur that the prisoner has not had a fair trial. Three persons passing along the

public road, on a Christmas frolic, fired off a Roman candle in his yard, and a pistol not far from his house. Instead of making allowance for the customary exhilaration of such occasions, he came out of his house, armed with a butcher knife, and made a sudden and furious murderous assault, killed one man, and seriously, almost fatally, wounded another. The jury found that this was not done in self-defense, nor upon heat of blood upon provocation. Of these facts they were the sole judges. There was evidence tending to show that the mind of the prisoner, who was a negro, had been inflamed by reading about the race troubles at Wilmington, and by having seen some of his race maltreated by white men at Selma that same afternoon. The prisoner had stated that "he had been reading about the Wilmington troubles, and thinking about them till he could not sleep, and that when he saw men in disguise he thought they had come to kill him." If, under that wrong impression, he took up the butcher knife and came out to kill the white men, there was surely some evidence tending to show premeditation, and that it was not the result of sudden provocation. It was not self-defense, but murder. The jury, not the prisoner, were to judge of the reasonableness of the apprehension (*State v. Harris,* 46 N. C., 190), and his Honor committed no error in telling them that if the ground of the prisoner's apprehension, or his motive, was (as the prisoner himself had intimated), "prompted by the occurrences at Wilmington, and the rioting at Selma, this would be a circumstance from which the jury might infer premeditation" on his part. His admissions showed he had been thinking over these matters with much intensity of feeling. Whether that thinking resulted in excessive and mistaken fear, or in malice, was for the jury, and if either motive caused the killing it was without legal cause on the part of the deceased, and was murder. The Attorney-General

being a white man, it may be presumed, would not be so
deeply impressed by occurrences not arousing feelings of
either fear or revenge in his race, but which the prisoner said
had not allowed him to sleep.   The Judge at least was cor-
rect in telling the jury it was a circumstance from which the
jury could infer premeditation, i. e., killing on purpose, and
not in self-defense or on sufficient provocation, and he told
them no more.   The fact that the prisoner came out of his
house without any further excuse than that the deceased and
his companions were passing along the road, in a boisterous
manner, on a Christmas occasion, and fired off a Roman can-
dle into a tree in the prisoner's yard (and the jury found that
state of facts, if they believed the State's evidence), might
well be taken into consideration coupled with the evidence
of his deep feeling over the Wilmington and Selma riots.
His extraordinary and unjustifiable assault might well have
been caused by such premeditation and a determination re-
sulting therefrom, either to avenge his race, or prevent a rep-
etition of such incidents towards himself.   Neither the
statute nor the decisions of this Court restrict murder in the
first degree to that deliberation which is used when the killing
is by lying in wait or by the administration of poison.   In
*State v. Norwood,* 115 N. C., 879, it is said that the jury may
find premeditation, no matter "how soon after resolving to do
so," the killing is done.   This language is approved in *State
v. McCormac,* 116 N. C., 1033, in which the Court holds that
"attendant circumstances rather than computation of the time
intervening between the formation and execution of the pur-
pose," throw light upon the question of premeditation.   In
*State v. Carrington,* 117 N. C., 862, it is said: "It is imma-
terial how soon after resolving to kill the prisoner carried his
purpose into execution."   These decisions are all under the
construction placed by *State v. Fuller,* 114 N. C., 885, upon

the Act of 1893, for the act itself contains nothing transfer-
ring to murder in the second degree the presumption of
malice raised theretofore by a killing with a deadly weapon.
In the present case the Judge left the admitted brooding of
the prisoner ("so he could not sleep") over the Wilmington
riot, together with his sudden rushing out of the house and
slaying with a butcher knife a harmless roisterer, or reveler
(if that synonym is preferable), on a festive occasion, and
the almost fatally wounding of another, as attendant circum-
stances, among others, from which the jury might decide
whether there was premeditation. Deliberation and premed-
itation may be inferred from facts and circumstances. *State
v. Booker,* 123 N. C., 713.

Whenever public opinion demands it, the Legislature can,
and will, abolish capital punishment, but it should not be
done by judicial construction. The prisoner has had a fair
trial before Judge and jury. It is to the verdicts of juries
that the people must look for protection of their lives and
property. The jury is the sole judge of the facts, and their
finding should be final, in the absence of error of law on the
part of the Judge, and I can see no error that he has commit-
ted in this case.

FURCHES, J., concurring. I concur in the opinion of
Justice MONTGOMERY, but feel that I ought to say something
in justification of my concurrence.

The statute of 1893 divided murder into two degrees, and
it has been discussed in so many cases that it would seem
that the change made in the law of murder by that statute
should be *recognized,* and pretty well understood by this time.

The rule prescribed by that statute entirely changed the
law with regard to murder in the first degree. Before that
statute, when the killing was admitted or shown to have been

with a deadly weapon, *the law presumed murder,* and the burden was then thrown upon the prisoner to show facts and circumstances in mitigation or excuse. This was a harsh rule, handed down to us as a part of the common law of England. Many of the States of the Union recognized the harshness of this law, and changed it by legislation years ago; but our Legislature made no change until 1893. It then divided murder into two degrees, first and second. The rule and the presumption with regard to the second degree is the same now that it was at common law. But with regard to murder in the first degree—after specifying several modes of killing, as by poisoning, etc.—it prescribed that any other killing, when done with *deliberation* and *premeditation,* shall be murder in the first degree. But the statute throws upon the State the burden of showing—proving—both *deliberation and premeditation.* Unless these rules are observed by the courts—if juries are allowed to find prisoners guilty of murder in the *first* degree without any evidence of *deliberation* and *premeditation,* the statute of 1893 is a nullity.

What, then, is the evidence in this case that the State insisted proved *deliberation* and *premeditation* on the part of the prisoner? He was at home, in the peace of God and the State, but not of these "festive, harmless roisterers," dressed in woman's clothing, armed with whiskey, Roman candles, and pistols. These "festive" fellows were at the prisoner's house, shooting into his yard, and guilty of an affray. *State v. Huntley,* 25 N. C., 418. And this view of the case was not presented to the jury.

But the State was asked to point out the evidence upon which it relied to prove *deliberation* and *premeditation.* The response to this inquiry was the fact that there had been a riot that evening between the negroes and the whites in Selma, and that there had been a riot in Wilmington last November,

and the evidence that the prisoner said that he had read about the Wilmington riot until he could not sleep.

The prisoner is shown to live in Johnston County, near Selma, and that he had no connection with the Wilmington riot; that he was in Selma the evening of the 26th, when the riot took place, but that he was not in it, and had nothing to do with it.

The Attorney-General, who contended that this evidence showed deliberation and premeditation, was asked if he had read about the riot in Wilmington, and he said he had. He was then asked, suppose there had been a riot between the negroes and whites in Lexington on the evening of the 26th of December, and you had been in Lexington at the time, but had nothing to do with, and that at ten or eleven o'clock that night three men had come to your house in the condition and manner that these three men went to the house of the prisoner, and a fight had ensued between you and them, and one of them had been killed, as related by the State's witnesses; do you think you ought to be convicted of murder in the first degree, because you were in Lexington that evening or because you had read about the Wilmington riot? He answered that he thought not; and so, it seems to me, that every honest, right-thinking man would say. And if it be no evidence of *premeditation* and *deliberation* against the Attorney-General, it should not be against the prisoner, unless we should have one rule of law for the trial of a negro and another for the trial of a white man. This we can not have.

This affair and the riot at Wilmington, and the riot at Selma, are greatly to be regretted by all good men, and it is hoped that the like will not occur again. Let these riots be among the things of the past. Let the dead bury their dead, but do not bring their ghosts into court to bury the living.

Douglas, J., concurring.   In concurring in the opinion of
the Court it is needless to remind the profession of the respon-
sibility of him in whose hands rests the life of a fellow being.
That responsibility must be fully met without fear or favor,
and the result determined solely by the law of the land, and
the facts of the case.   If the facts were different, so would be
my opinion; and hence, I am unwilling to have my action
judged upon any supposed state of facts, not shown in the
record.   This would be equally unjust to the prisoner and to
the Court.   If the prisoner had rushed out of the house,
armed with a butcher knife, and had immediately made a
sudden and murderous assault, my opinion would be differ-
ent; but this the prisoner did not do, and I can find no wit-
ness that says he did.   There were only three men in the
party.   ·Cawthorn was killed, and Garner swears that he ran
away when the dog began to bark, and did not come back until
after the assault on Cawthorn, and immediately left again.
So, Winfree was the only witness who was present when the
prisoner came to the gate.

What does Winfree say?   These are his exact words, on
cross-examination, as taken from the record:  "Prisoner
came out and asked if that was Pendergrass; I said 'no;' I
then said to Cawthorn 'we can get a ride;' prisoner said 'that
is my father and mother;' am almost positive that I said,
'we'll shoot the damn dog;' can't say whether this was before
or after I said we would get a ride; it was all about the
same time."   And again Winfree says:   "Had no feeling
against prisoner; did not know him then; was not under the
influence of whiskey; *prisoner seemed friendly when he came
to the gate; he did not seem to be mad.*"   Where then is the
rushing out of his house, and the sudden murderous attack?
Here were three disguised men who were already guilty of an
affray under the laws of this State, and whom the prisoner

125——40

knew to be armed, as a pistol had just been fired; and yet this evidence shows that the prisoner came out to the gate in a friendly manner, asked if it was Mr. Pendergrass, and never struck a blow until after an assault was threatened upon his aged parents, coupled with the equivocal remark, "We'll shoot the damn dog." And yet we are told that the prisoner had no provocation beyond the boisterous conduct of a harmless roisterer. There are no harmless roisterers. That species of roisterer, if it ever existed, became extinct before the dawn of history. Various definitions of the word are given in the dictionaries, all unfavorable. The Century Dictionary says it is derived from the old French word "rusterer" meaning ruffian. The word is Shakesperian; and if we look to Shakespeare, and the current literature of the times, we shall learn the character of the "roistering blades" that followed Falstaff and Prince Hal. So far from being harmless, they became such an unmitigated nuisance that their leader was sent to jail, although the son of England's king, and the heir of England's throne.

Let us reverse the case, for the sake of argument: Suppose that three negroes, disguised and armed, had come to a white man's house, and after he had come to the gate in a friendly manner, had threatened to get into the cart with his aged father and mother, what would he probably do? I fear it would not require any premeditation for a ready weapon to meet a willing hand.

I have no intention whatever of abolishing capital punishment by judicial construction. In fact, it should be remembered that the distinction between murder in the first and second degree was not made by the decisions of the Court, but by an express act of the Legislature, chap. 85 of the Laws of 1893.

At the February Term, 1894, in *State v. Fuller,* 114 N. C.,

STATE *v.* SMITH.

885, this statute was construed as casting upon the State the burden of proving premeditation. The concluding paragraph of the opinion of the Court, delivered by Justice AVERY, meets my unqualified approval. This decision has been uniformly followed, and was approved by a unanimous Court, in *State v. Booker,* 123 N. C., 713.

I do not say that the prisoner is innocent of crime. If the verdict had been for manslaughter, or even for murder in the second degree, I would not have felt justified in disturbing the judgment of the Court below, for the killing with a deadly weapon presumes malice, but not premeditation.

In conclusion, I can only say that I am not a follower of Draco, and have no desire to be considered the especial avenger of blood. I can do the right only as I am given to see the right; and I have no ambition beyond the performance of my duty in such a manner as to make everyone feel and know that, so far as depends upon me, no one is so rich and powerful as to be beyond the avenging arm of the law, and none so poor and humble as to be beneath its completest protection.