## STATE v. POTTER.

(Filed April 5, 1904).

HOMICIDE—*Conspiracy—Evidence—Instructions.*

> In a prosecution for murder an instruction on conspiracy between the prisoner and another is erroneous, there being no evidence tending to show such conspiracy.

CLARK, C. J., dissenting.

INDICTMENT against Clarence Potter, heard by *Judge B. F. Long* and a jury, at Spring Term, 1903, of the Superior Court of WATAUGA County. From a verdict of guilty of murder in the first degree, and judgment thereon, the prisoner appealed.

*Robert D. Gilmer, Attorney-General,* for the State.
*W. H. Bower,* for the prisoner.

MONTGOMERY, J. The prisoner was convicted of murder in the first degree of A. W. Howell at Spring Term, 1903, of the Superior Court of Watauga County. There was evidence on the part of the State tending to show that a warrant was issued by a justice of the peace and placed in the hands of Calvin Turnmire, a constable, to be served on the prisoner, and that another warrant issued by a justice of the peace named Smith, in which the prisoner and Boone Pot-

ter, his near kinsman, were intended to be charged with a forcible trespass, was placed in the hands of the deceased as a specially deputized officer for service on the accused; that Turnmire and the deceased, together with Will Hamby, Joe Wilson and June Snider, on the night before the homicide, met and stayed all night in the house of a man by the name of Hodges, a short distance from a saw-mill where it was anticipated that Clarence and Boone Potter would bring saw-logs to the mill; that on the early morning of the next day, the 5th of November, Clarence and Boone arrived with a load of logs on a wagon drawn by four mules, whereupon Turnmire, who testified that he had summoned Hamby to assist him in the arrest of Clarence, while the deceased and the others, Wilson and Snider, were to arrest Boone, walked up to Clarence and told him that he had a warrant for him; that Hamby read the warrant to Clarence who was standing behind the wagon and about fifteen or twenty paces from Boone, who was in front of the lead mule; that Hamby, when he read the warrant in an ordinary tone had his back towards Boone, and that just about the time of the conclusion of the reading of the warrant by Hamby to Clarence, Boone came around to Clarence and said "Come on, cousin"; whereupon both mounted the wagon and drove rapidly off down the road toward their home. There was no evidence that either one of the party had said a word about the arrest of Boone before the wagon was driven off. The whole posse overtook and headed off the team, after having given chase for about three hundred yards, at a branch or creek that crossed the road. The witnesses for the State testified that the deceased, with a pistol in one hand and the warrant plainly visible in the other, headed off Boone who was driving the team, at the same time demanding his surrender and notifying him that he had a warrant for his arrest; that thereupon Clarence, who was on the other side of the team,

handed his pistol across the hind mule to Boone, who there-upon shot the deceased in the arm and breast, while almost at the same time the prisoner Clarence struck the deceased on the forehead with a large stone. The prisoner testified that the deceased fired at Boone first. Howell died three days afterwards. Four physicians were examined, but we can get very little out of their evidence, except that either wound might have caused the death.

The case was tried with great care by his Honor, and with marked ability he instructed the jury upon the many perplex-ing and important features of the case. In one aspect of the case, however, his Honor committed an error, that error being founded on a mistaken view of the nature of certain of the evidence. His Honor in stating the contention of the State used this language: "Upon this indictment the State first maintains that the prisoner is guilty of murder in the first degree; that he maliciously and feloniously, and with premeditation and deliberation, slew the deceased with a deadly weapon, or aided, assisted and helped to do it, or conspired, co-operated and acted in concert with Boone Pot-ter in thus slaying the deceased." It is to be seen from the contention of the State that a *conspiracy* on the part of Boone and the prisoner to kill the deceased was one ground upon which the State relied to show deliberation and premedita-tion on the part of the prisoner, and on that point his Honor instructed the jury: "You are instructed further that the burden is upon the State to satisfy you beyond a reasonable doubt, not only that the killing was done by the prisoner, or by his assistance, aid, help and consent, or in consequence of concert and *conspiracy* with another (the word conspiracy italicised by us), but also with deliberation and premedita-tion. * * * And if you find that the prisoner slew the deceased with a deadly weapon, or that he conspired with or aided and abetted Boone in doing the killing with a deadly

134——46

weapon, you will examine all the evidence and circumstances and say whether you are satisfied from them that the killing was done with premeditation and deliberation, and if you so find, you will find the prisoner guilty of murder in the first degree." His Honor, to make clearer his meaning in connection with that part of his charge, said: "In other words, if the State has shown beyond a reasonable doubt—and you so find—that the deceased and those associated with him had a lawful warrant from a justice of the peace to arrest Clarence Potter, the prisoner, and also a lawful warrant to arrest Boone Potter for shooting into and breaking into a house, and on the day the deceased was injured the deceased and the posse with him, duly summoned for the purpose and acting with him as such posse, read the warrant to Clarence and notified him to consider himself under arrest, and that this was done openly in the daytime within about fifteen paces of Boone Potter, and you further find that Clarence failed to submit to the arrest, but under a suggestion of Boone got on the wagon then and there hitched, and under their control, and hurriedly drove away, and you further find that the deceased and his associates with their warrants pursued and overtook them, said Clarence and Boone and their associate, Heck, at the branch, and that thereupon the deceased, with the warrant open in his hand, notified Boone that he had a warrant for him, in hearing distance of Boone and Clarence, and by declarations made by the deceased or the posse both Boone and Clarence were fixed with the knowledge that the deceased and his associates were clothed with a warrant to arrest Boone, and you find that Boone hastily descended from the wagon on one side and Clarence on the other, and by pre-concert and understanding and agreement between themselves the prisoner handed Boone a pistol over the mules in consequence of words or motions between themselves, and thereupon Boone delib-

erately and premeditatedly shot at the deceased twice in
rapid succession with the deliberate intention to take his
life, and you find that the death of the deceased ensued from
the wound inflicted, Boone Potter would be guilty of murder
in the first edgree; and if, in addition to the foregoing facts
you find that Clarence understood that the officers had a
warrant for himself and had read it to him, and that he
was there engaged in escaping from the officers, and that
Boone understood this, and that they were acting in concert
in flight, and you find that Boone and Clarence from their
acts and conduct were acting in concert throughout, and both
had predetermined and agreed to resist arrest to the extent
to take the life of any one of the officers authorized to exe-
cute the warrant, and with premeditated and deliberate pur-
pose to resist the arrest of Boone by the deceased or his
associates, or the arrest of himself, the object of the officers
being known, and with a premeditated purpose to kill to
effect their purpose, and in pursuance of this purpose he
handed Boone the pistol to kill the deceased, and Boone shot
the deceased with the pistol and thereby inflicted injuries
from which the deceased died, the prisoner is guilty of
murder in the first degree, and you will so find."

It is clearly to be seen from his Honor's instruction that
he not only regarded what occurred at the saw-mill at the
time the officers attempted to arrest Clarence as evidence
tending to show a part of a conspiracy between Boone and
Clarence to resist the officers, even if it became necessary to
kill one or all of them, but he carefully recited to the jury
all the incidents connected with the attempted arrest. We
cannot agree with his Honor that the facts connected with
the attempted arrest at the saw-mill furnished any evidence
whatsoever of a conspiracy to kill one or all of the officers or
any one of the posse. Boone, by all of the evidence, did not
know at the saw-mill and at the time of the attempted arrest

of Clarence that any warrant had been issued for him. It seems that the jury believed that Boone heard the warrant read to Clarence, although he was fifteen or twenty paces off with a wagon and four mules between him and Hamby who read the warrant, and Hamby speaking in an ordinary tone and with his back towards Boone; but that evidence having been believed by the jury, though it might have been sufficient to justify them in finding that there was an agreement between Boone and the prisoner entered into at the very time of the arrest of Clarence to effect the escape of Clarence, it certainly, in our judgment, was not evidence of a conspiracy to kill the deceased or any member of the posse. In fact the witnesses for the State showed that neither Boone nor Clarence had made any preparations to use Clarence's pistol on the occasion before the arrival of the party at the branch where the team was headed off, neither Boone nor the prisoner had heard anything of the warrants or the preparations to arrest either Boone or Clarence before their arrival at the saw-mill; and at the branch Clarence's pistol was between his overalls and his trousers, and his suspender had to be unbuttoned before he could get the pistol out; all of which goes to show that not until the parties left the saw-mill was there any preparation made to use the pistol.

As we have said, this case was conducted by his Honor with marked ability, and so far as his connection with the making up of the case on appeal is concerned all is correct; but the remainder of the record comes before us in poor shape. In many parts of the evidence bearing on vital points of the case we are at a loss to understand what the witnesses said; then, there are hyphens and blank spaces and inconsistent words, confusing to the understanding. This is especially so in respect to the two warrants said to have been issued for the prisoner and Boone. Those papers are referred to as Exhibits "A" and "B," but they are no-

where to be seen in the record. They are not alleged to have been lost and no proof of their contents is offered.

For the one error pointed out there must be a

New Trial.

CONNOR, J., concurring. I would be content to concur in the opinion written by *Mr. Justice Montgomery* without saying more, but for the fact that my understanding of the testimony is so entirely different from that of the *Chief Justice,* as set out in his dissenting opinion, that I feel constrained to give my reasons for concurring in the conclusion arrived at by the majority of the Court. If I understood the facts as does the *Chief Justice* I should not hesitate to concur in his conclusions as to the law. It is a source of regret to me that it is sought to place the majority of the Court in the position, from the viewpoint of the *Chief Justice,* of giving encouragement to the commission of murders in this State. As I gather the transactions from the State's witnesses, Turnmire had a warrant for the arrest of the defendant for a misdemeanor, and the deceased Howell had a warrant for the arrest of Boone Potter. There was much controversy as to the regularity of the warrant and the deputation to Howell, and although these warrants were used upon the trial, and are referred to in the testimony as Exhibits "A" and "B," they are not attached to the record in the case, and we are unable to pass upon their regularity. Defendant is a young man of nineteen years, uneducated; Boone Potter, it seems, was older; they are cousins; they were engaged in hauling logs to a saw-mill. On the night prior to the homicide Turnmire and Howell collected a posse composed of one Joseph Wilson, who said that he had served a term of eight years in the Penitentiary, Hamby and Snider, at the house of one Hodges. On the morning of the homicide they went to the mill and in a

short time the defendant and Boone Potter drove up with
their wagon; Turnmire and Hamby called the defendant
out to one side, four or five steps from the wagon, and told
him that they had a warrant for him. Hamby's account of
the transaction at this point was as follows: "Defendant
said 'All right'; Turnmire handed warrant to me and told
me to read it, and I read it; defendant two feet from me;
I read it in common tone; Boone was then fifteen steps off.
Had my back to Boone. Defendant said: 'I cannot have
my trial to-day, I have got to help Boone haul logs.' De-
fendant asked Turnmire to file bond. Turnmire said: 'Yes,
we will do what is right.' Defendant asked if he would
take his father on bond. He said 'Yes, anybody most.'"
The defendant's testimony upon this point is as follows:
"On night prior to the homicide was at Boone Potter's;
lived there, worked for him. He was logging; took log
to mill on that morning; Turnmire told me they had war-
rant for me. I asked him to let me change some clothes;
he gave me leave; I asked him if he'd take father on my
bond, and he said 'Yes.' It was raining, I wanted dry
clothes; he said 'All right.' I got on the wagon; I thought
(he) was coming on; we got on wagon and started towards
home; sorter rainy; Boone trotted off. When he is not
loaded, drives fast." Hamby says: "I heard Boone talking,
and we come to where Wilson, Howell and Snider were;
could not hear what Boone said until after I turned round.
He said, 'Go down with me, cousin'; bounced upon wagon
and told Clarence to come on; defendant slipped on wagon
as Boone started off in a trot. Boone began whipping mules;
am kin to Boone and Clarence by marriage. I said to How-
ell, 'Now what are you going to do? We will run on down
and arrest them.' We ran on down to where they crossed
the creek, Howell in front." There was no evidence that a
word was said to Boone about the warrant for him, or that

STATE *v.* POTTER.

he knew that there was such a warrant or a warrant for defendant, nor is there any evidence that the defendant knew that deceased had a warrant for Boone. There seems to be no substantial difference in the testimony in regard to what occurred at the time of the homicide. After the wagon drove off some of the witnesses used the term, "The mules loped down the hill." The deceased and his posse ran after them. The mules, at the foot of the hill, came to a stop, when the homicide occurred in the manner set forth in the opinion of the Court.

The portion of his Honor's charge to which defendant excepted, and which exception, I think, should be sustained, is as follows: After saying to the jury that if they found certain conditions, his Honor said: "And if in addition to the foregoing facts you find that Clarence understood that the officer had a warrant for himself, and had read it to him, and that he was then engaged in escaping from the officers, and that Boone understood this, and that they were acting in concert in flight, and you find that Boone and Clarence were acting in concert throughout and that both had predetermined and agreed to resist arrest to the extent of taking the life of any one of the officers authorized to execute the warrant, and with premeditation and deliberation purposed to resist the arrest of Boone by the deceased or his associates, or an arrest of himself, the object of the officers being known, and with the premeditated purpose to kill to effect their purpose, and in pursuance of this purpose he handed Boone the pistol to kill the deceased, and that Boone shot the deceased with the pistol and thereby inflicted injuries from which deceased died, the prisoner is guilty of murder in the first degree, and you will so find."

There can be no question that the law as laid down by his Honor is correct, but I cannot find in the testimony any evidence to support the theory submitted to the jury that

Boone and the defendant had formed and preconceived a purpose to resist arrest to the extent of taking the life of the officers or their associates. I can find no testimony tending to show that Boone had any knowledge that the deceased had a warrant for him or that Clarence had any such knowledge, nor can I see any evidence that Clarence was attempting to escape arrest. Taking the testimony of the State's witnesses and of the defendant, which in no material respect contradicts them, I can see nothing in the conduct of Clarence at the time the warrant was read to him indicating a purpose to resist the arrest. His suggestion to the officer to give his father as security, followed by the officer's acceptance of the suggestion, excludes to my mind any possible theory of a purpose on his part to resist an arrest. No witness says that Boone heard or could have heard the conversation between Turnmire, Hamby and Clarence. His conduct appears to me to be entirely consistent with that of a man in his station in life making his daily bread by his labor; he had unloaded his wagon and I can see nothing in his conduct inconsistent with what might have been expected of a man of his occupation. It is not denied that it was a rainy day. As he drove off he went down hill. The fact that he hit his mules with his whip and that they loped off does not impress my mind with any purpose to escape the posse or officers in the absence of any evidence that he knew or suspected that they had any warrant for him. If I am correct in my conclusion that there was no evidence to sustain the theory of a preconceived purpose between the defendant and Boone Potter to escape arrest, to the extent of taking the life of the officers, then such theory should not have been submitted to the jury. This is elementary. I do not undertake to say that at the time of the homicide there was no evidence of premeditation. The doctrine of instantaneous premeditation seems to be well established by this Court, and in deference

to the opinions of the eminent judges who have preceded me I have given it my approval in the disposition of appeals which have come before us.

In the light of these decisions, it was not error in his Honor to leave the question to the jury whether the homicide was the result of premeditation. I do not think that the defendant should have been required to carry with him to the jury the theory of a preconcerted purpose in combination with Boone to resist arrest to the extent of taking the life of the officer or his associates. Upon his own showing, this uneducated young mountaineer, before reaching his majority, is guilty of murder in the second degree. It is more than probable that, at the best, he will forfeit to the State more than a score of years of his freedom. I make no comment on the unfortunate man who lost his life. Whether he was a "brave officer" or not I do not know, and I forbear saying more, upon the record before us, than that it is fortunate for the administration of our criminal law that it is not the custom to proceed as these men did in the arrest of persons charged with violating the law. I cannot think, from his own testimony, that the majesty of the law was promoted or respect for it increased by the services of the witness Wilson. But these are not questions before us. I cannot but regret that it so frequently occurs that such widely divergent views exist in this Court in regard to the plainest principles of the criminal law. I am sure that each member of this Court is prompted by no other motive or purpose than to declare the law as he believes it to be, and as befits a Judge. Certainly the State has made ample provision for the protection of her officers in the discharge of their duties, and I am sure that the Judges of the Superior Court and of this Court do all in their power to enforce the law in this respect. This defendant is, upon his own testimony, guilty of murder—a jury may, upon another trial find him guilty

of the capital felony. This will be for the jury. I express
no opinion in respect to their duty. I simply give expression
to my conviction that there was no evidence that the homi-
cide was the result of a preconceived purpose between the
two men engaged in the affair to resist arrest to the extent of
taking the life of the officer.

WALKER, J., concurring. I concur in the opinion of the
Court as delivered by *Justice Montgomery,* and also in the
opinion of *Justice Connor,* as his views in regard to one
aspect of this case, which are therein fully and clearly ex-
pressed, coincide with mine, and I shall add but a few
words to what he has so well said. The learned and able
Judge who presided at the trial of this case charged the jury
correctly as to the law of "premeditation and deliberation,"
so far as the charge was confined to what occurred at the
branch when Boone Potter and the defendant were over-
taken by the posse, but he fell into error, I think, when he
added: "If, in addition to the foregoing facts, you find that
Clarence understood that the officers had a warrant for him-
self and had read it to him, and that he was then engaged
in escaping from the officers, and that Boone understood
this, and that they were acting in concert in flight, and you
find that Boone and Clarence, from their acts and conduct,
were acting in concert throughout and both had predeter-
mined and agreed to resist arrest to the extent of taking the
life of any one of the officers, being known, and with a pre-
meditated purpose to kill to effect their purpose, and in pur-
suance of this purpose he handed Boone the pistol to kill the
deceased, and Boone shot the deceased with the pistol and
thereby inflicted injuries from which the deceased died, the
prisoner is guilty of murder in the first degree, and you will
so find."

There was no evidence whatever as to any preconcerted

STATE *v.* POTTER.

design to resist arrest prior to the time the officers overtook and stopped them at the branch.    Indeed, the evidence as to the transactions up to that time tended to prove directly the contrary.    I do not think it can be successfully contended that the two men had conceived the purpose to resist arrest when they were driving away from the officers and in the direction of their home with all possible speed.    Even if Clarence had not supposed that his offer to give his father as bail was satisfactory (and there is evidence to show that he did think it had been accepted), and even if Boone Potter was aware of what had taken place between Clarence and the officers and thought that they had attempted to arrest him, and if the two were not merely returning to their home as they supposed they had a right to do, but were attempting to escape from the officers, I yet do not think that the instruction which I have quoted from the charge of the Court was correct.    There is a vast difference in law between trying to escape arrest and forming a conspiracy or preconcerted design to resist it.    The rights of the parties in the two cases given are essentially different, and this difference we stated fully at the last term in *Sossamon v. Cruse,* 133 N. C., 470.    There is no proof in the case of anything said or done by the Potters when they were driving towards the branch that has the slightest tendency to show a preconcerted design to resist arrest, and this being so it only remains to be considered whether the instruction was calculated to prejudice the defendant.    It is hardly necessary to argue this question, as the harm to the defendant is perfectly apparent on the face of the instruction.    Nothing can be more prejudicial than a charge to the jury to convict based upon a theory not supported by the evidence.    *State v. Smith,* 125 N. C., 615.

CLARK, C. J., dissenting.    The prisoner is not indicted for nor convicted of conspiracy, but of murder.    His Honor told the jury that "The burden is upon the State to satisfy

STATE *v.* POTTER.

the jury beyond a reasonable doubt, not only that the killing was done by the prisoner or by his assistance, aid, help and assent *or* in consequence of concert and conspiracy with another, but *also* with deliberation and premeditation,    *    * and if you find that the prisoner slew the deceased with a deadly weapon, *or* that he conspired with *or* aided and abetted Boone in doing the killing with a deadly weapon, you will examine *all the evidence and circumstances and say whether you are satisfied from them that the killing was done with premeditation and deliberation,* and if you so find you will find the prisoner guilty of murder in the first degree."

It would be difficult to make the charge more absolutely in accordance with the precedents. The learned and accurate Judge was not charging upon an indictment for conspiracy nor telling the jury what would amount to a conspiracy. He recited the evidence as it was his duty to do, but impartially and fairly. It was in evidence that when the summons was served upon the prisoner, Boone, who was near by, called to the prisoner to jump on the wagon and immediately the horses were put into a lope down the hill, and this by men both of whom had been evading arrest; that the deceased officer and his posse started after them and headed them off and with his warrant in one hand and pistol in the other the deceased (who as an officer had a right to carry the pistol) ordered Boone to stop. Then Boone Potter said to the prisoner "Shoot, or give me the pistol," and motioned to the prisoner to hand him the pistol, and he did so; whereupon Boone fired at the officer. This was sufficient aiding and abetting, combining and conspiring to make the prisoner guilty, whether (as is doubtful) the prisoner or Boone killed the deceased. Though the Judge recited the evidence as it was his duty to do, he did not (as the opinion assumes) tell the jury that the action in putting the

horses into a lope was a conspiracy or combination, nor could the Court tell them it was, nor that it was not. The remark "Shoot, or give me the pistol" is certainly some evidence, taken with the other circumstances, of a combination or conspiracy, the pursuit of a common design. That was for the jury to consider, for the jury also alone could say whether Boone knew the warrant had been served on Clarence, as he had the opportunity to do (*State v. Bowman,* 80 N. C., 432; *State v. Perkins,* 10 N. C., 377), and was acting in concert in the flight. The motion for the pistol, the accompanying remark, and the handing it over under the circumstances, the immediate use of it by Boone, and the prisoner joining in the attack with a rock, certainly constituted some evidence (and very strong evidence) of aiding, abetting, combining and conspiring, and if there was *any* evidence it was properly left to the jury. The Court told the jury that *they* should examine the evidence, and if "upon all the evidence and circumstances the jury was satisfied of premeditaton and deliberation, etc." Upon all the authorities (unless they are to be overruled) a moment of premeditation, no matter how brief, is sufficient, if the jury find that there was premeditation and deliberation. *State v. Dowden,* 118 N. C., 1145, and numerous cases since.

The deceased was an officer bravely and faithfully trying to obey the process which his State had put into his hands to be served. The prisoner and Boone were defendants in that warrant, resisting the power of the State. When halted and the process shown him, Boone motions to the prisoner to hand him his pistol; he evidently knew the prisoner had it; the latter hands it over and for use on the deceased, as the jury had a right to infer. Boone fires upon the officer because he was trying to serve the warrant, and the prisoner joins in the assault upon the officer with a stone. Which caused the death is immaterial. There was

a joint action, a combination and conspiracy in the doing of the unlawful act. There was no self-defense or manslaughter, as the jury found the facts to be, and the jury having found, as the Judge instructed them was necessary, first, that there was joint action by aiding, abetting or combining and conspiring, and then further that the killing was done with premeditation and deliberation, there could be no other verdict than murder in the first degree.

If there is no liability to capital punishment for taking the life of an officer under the circumstances of this case, then the only safe method of serving process on those defying the State's authority will be service by mail or with a shotgun, and the Legislature should so provide, authorizing the officer to fire first. The life of the officer is worth at least as much to the State and to his family and friends as that of the defiant law-breaker, and the life of the latter is not the only one that should be regarded with tenderness in the administration of the law. The Legislature in its wisdom can abolish capital punishment except when the killing has been done by lying in wait or poisoning (and indeed in all cases), but it has not seen fit to do so. No case could be presented more strongly demanding the capital sentence of the law than this, where two men who had been defying the law and the service of its precepts are halted by an officer with the State's process in his hand, and one of them motions to the prisoner for his pistol, which is passed over to him by the prisoner, and both unite with pistol and rock in taking the officer's life for no other cause than that he was there honestly, faithfully endeavoring to obey the trust the State had confided in him. Is the State not strong enough, is it not just enough to vindicate its majesty and execute the law against the wilful murderer of its own officer when its process is thus defied and its officer slain without provocation or excuse for no fault save that

he was endeavoring to do his sworn duty? Shall the condition of him who defies the law be so far better than that of him who shall attempt to execute it that the officer may lose his life but the law-breaker cannot? That State certainly cannot have faithful service which is more tender of the life of him who resists and slays an officer in the discharge of duty than careful to throw the terror of its power as a shield around the officer who would execute its orders.